289 N.J. Super. 503 (1995)
674 A.2d 589
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JAMES CHERRY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted October 3, 1995.
Decided December 18, 1995.
*509 Before Judges PRESSLER, KEEFE and ARIEL A. RODRIGUEZ.
Susan Reisner, Public Defender of New Jersey, attorney for appellant (Arnold I. Budin, Designated Counsel, on the brief).
Deborah T. Poritz, Attorney General of New Jersey, attorney for respondent (Lisa Sarnoff Gochman, Deputy Attorney General, of counsel and on the brief).
James Cherry, appellant, filed a pro se supplemental brief.
The opinion of the court was delivered by KEEFE, J.A.D.
On September 30, 1970, Atlantic City police officer, John Burke, was killed by a shotgun blast to his throat. He was in uniform and on duty at the time. On December 18, 1970, defendant, James Cherry, was indicted for second degree murder, contrary to N.J.S.A. 2A:113-1, -2 (count one), and first degree murder of a police officer in the execution of his duties, contrary to N.J.S.A. 2A:113-1, -2 (count two).
*510 By the time the indictment was returned, defendant had fled Atlantic City to Cuba. He stayed there until September 27, 1990, when he surrendered to the FBI in Miami, Florida. He subsequently waived extradition and was returned to New Jersey. After a twelve day jury trial, defendant was found guilty on both counts of the indictment. The trial judge merged count one into count two for the purpose of sentencing, whereupon defendant was sentenced to life in prison.
Defendant now appeals and presents the following issues for resolution.
POINT I THE TRIAL COURT ERRED IN ALLOWING THE VICTIM'S OUT-OF-COURT IDENTIFICATION OF DEFENDANT TO GO TO THE JURY
POINT II THE TRIAL COURT ERRED IN ADMITTING THE IN-COURT IDENTIFICATION OF THE DEFENDANT BECAUSE THE IDENTIFICATION WAS TAINTED BY THE SUGGESTIVE OUT-OF-COURT IDENTIFICATION
POINT III THE IMPROPER ADMISSION INTO EVIDENCE OF A CO-CONSPIRATOR'S HEARSAY TESTIMONY PURSUANT TO EVID.R. 63(9)(B) AND EVID.R. 55 DEPRIVED THE DEFENDANT OF DUE PROCESS OF LAW WHERE THE HEARSAY WAS IRRELEVANT, THE COURT FAILED TO MAKE A FINDING ON THE SUFFICIENCY OF THE EVIDENCE TO SUPPORT THE CONDITION OF RELEVANCY, AND THE COURT FAILED TO INSTRUCT THE JURY PURSUANT TO EVID.R. 6 OF THE LIMITED EFFECT TO BE GIVEN TO THE HEARSAY TESTIMONY
POINT IV IT WAS IMPROPER TO ADMIT THE HEARSAY STATEMENT OF FORMER DEFENDANT AS A CO-CONSPIRATOR TO CONCEAL EVIDENCE WHERE THERE WAS NO EVIDENCE OF THE ALLEGED CONSPIRACY OR OF THE DEFENDANT'S PARTICIPATION THEREIN
POINT V IMPROPER ADMISSION OF PRIOR INCONSISTENT STATEMENT DENIED THE DEFENDANT A FAIR TRIAL WHERE THE COURT DID NOT DETERMINE WHETHER THE PRIOR STATEMENT WAS MADE OR SIGNED UNDER CONDITIONS ESTABLISHING SUFFICIENT RELIABILITY
POINT VI THE JUDGE'S FAILURE TO CHARGE THE JURY TO CONSIDER ALL RELEVANT CIRCUMSTANCES TO EVALUATE WHETHER RELIABILITY HAD BEEN SUFFICIENTLY ESTABLISHED IN ASSESSING THE CREDIBILITY AND PROBATIVE WORTH OF PRIOR INCONSISTENT STATEMENT ADMITTED AS SUBSTANTIVE EVIDENCE DENIED DEFENDANT A FAIR TRIAL
POINT VII THE PROSECUTOR'S HIGHLY IMPROPER AND PREJUDICIAL REMARKS CONCERNING THE DEFENDANT'S POLITICAL MOTIVE, *511 INTENT AND STATE OF MIND FOR FIRST DEGREE MURDER OF A POLICEMAN, MADE THROUGHOUT THE TRIAL, CRIMINALIZING THE DEFENDANT'S MEMBERSHIP IN AN UNPOPULAR POLITICAL ORGANIZATION, VIOLATED HIS FIRST AND FOURTEENTH AMENDMENT RIGHTS
POINT VIII TRIAL COURT'S FAILURE TO ACCURATELY AND COMPLETELY CHARGE THE JURY ON THE ESSENTIAL ELEMENT OF INTENT IN FIRST DEGREE MURDER OF A POLICEMAN DEPRIVED DEFENDANT DUE PROCESS OF LAW
POINT IX THE TRIAL COURT'S FAILURE TO CHARGE THE JURY IN ACCORDANCE WITH THE 1965 AMENDMENT TO N.J.S.A. 2A:113-2 DEPRIVED DEFENDANT OF DUE PROCESS
POINT X PREJUDICIAL EFFECT OF PLAIN ERROR IN ERRONEOUS INSTRUCTION OF N.J.S.A. 2A:113-2 AS TO FIRST DEGREE MURDER OF POLICE OFFICER WHERE PROOF FAILED TO INDICATE OFFICER WAS IN THE EXECUTION OF HIS DUTY, RESULTED IN THE DEFENDANT'S CONVICTION FOR FIRST DEGREE MURDER AND VIOLATED DUE PROCESS OF LAW.
We have carefully reviewed the record in light of the issues presented and affirm the judgment under review for the reasons stated herein.
The trial record reveals that a jury could have found the following facts. The shooting occurred in front of the Paddock Bar located on Atlantic and Illinois Avenues in Atlantic City. Detective William Horner, an off-duty Atlantic City police officer, was inside the bar at the time and heard the shotgun blast. Almost simultaneously, Shelly Kravitz, the owner of the bar, rushed in and exclaimed "that two colored men just downed a cop outside the bar."[1]
Detective Horner ran outside and observed Burke lying in front of his patrol car. His throat was blown apart and there was a fragment of a shotgun shell embedded in his throat. Burke's gun was still holstered, and his patrol dog was in the car, leashed to the door. Detective Horner observed a green duffel bag several feet from the victim, and an empty shotgun casing. He approximated the time to be about midnight.
*512 Three days later, Officer William Stewart went to an alley near Leeds Place on the report of a person finding several shotgun shells. After retrieving the shells, Stewart searched the alley and found a sawed-off shotgun in a brown shopping bag. Defendant's father lived on Atlantic Avenue, between Ohio Avenue and Leeds Place. The gun was found near his apartment.
The shotgun was examined by a State Police Officer who testified that the spent shotgun shell found at the scene compared positively to tested shells fired from the shotgun.
Katherine "Kitty" Feifer was employed as the seating hostess for the Paddock Bar at the time of the shooting. Sometime between 10:30 and 11:00 p.m. on the night of the shooting, Feifer observed two black men walk into the bar. Feifer approached them and asked if they wanted to be seated. Neither of the two men responded. The taller of the two went to the men's room and the other followed Feifer to the cigarette machine in the middle of the room. The shorter man, the one who went to the area of the cigarette machine, was carrying an object in his left hand that was wrapped in what Feifer described as a burlap bag or laundry bag. The area was well lit. The object was partially concealed by the sleeve of the man's overcoat. Feifer became suspicious because both men were wearing overcoats and it was a warm night. Feifer, who is five foot five inches tall but wore high heeled shoes, was almost at eye level with the man who was carrying the bag. When the taller of the two men exited the men's room, both men left the bar without saying anything to Feifer. Feifer was so concerned about their behavior that she informed Kravitz about them after they left.
Feifer said that about an hour later, Kravitz exited the bar but came running back in shortly thereafter shouting that a cop had been shot. She followed Kravitz outside and observed Burke lying in the street and a bag nearby. The bag was the same one the man had been carrying earlier that evening in the bar.
Feifer talked to several police officers and gave a description of the men and the bag. She also spent time with a sketch artist *513 who produced two drawings that looked like the men who entered the bar that evening. Feifer said that the man with the bag had a goatee-like beard and was thin, approximately five foot six inches to five foot eight inches tall, with a short afro haircut.
Officer Stewart knew both the defendant and Craig Jackson. When Stewart saw the composite drawing, both individuals came to mind. Stewart remembered that defendant had a goatee, a Foo Manchu mustache, and was very thin. (Defendant's gun permit application listed defendant as five foot ten inches tall and 160 pounds.)
Feifer testified that she recollected viewing photographs five or six times between October and December 1970. She remembered seeing different groups of photographs at different times. Feifer believed that she identified a photograph of the defendant sometime in November and then again picked out other photographs of defendant on a later occasion in December, 1970. Numerous photographs were marked at the time of trial, and Feifer testified that she had identified the photographs marked numbers eight, twenty-seven, twenty-eight and thirty, all of which were of defendant.
Detective Dooley of the Atlantic City police department contradicted Feifer's testimony concerning the number of times she viewed photographs. According to Dooley, Feifer identified several photographs on December 10, 1970. He said that Feifer was not shown a picture of defendant before that time. On December 10, Feifer was shown a forty-two picture array whereupon Feifer identified photos eight, twenty-seven, twenty-eight and thirty.
All of the pictures in the array were black and white photographs. There were multiple photographs of the defendant, but Dooley said he was not concerned about showing multiple photographs of defendant to Feifer because there were multiple photographs of others as well. For example, Craig Jackson's photographs appeared two times and Larry Good's photographs appeared three times, including an enlarged version of Good's mugshot.
*514 Good had become a suspect when, on October 16, 1970, Feifer identified a photograph of him. However, the photograph had been "doctored" to include glasses, facial hair and a goatee in an effort to make it look like the composite. Inspector Kane, who interviewed Good after Feifer's identification, concluded that he was not a viable suspect and testified that Good did not resemble the composite sketch.
Inspector Kane conducted a search of the Atlantic City Black Panther Party's headquarters in December 1970. He found a strip of negatives, and after holding them up to the light, recognized photographs of defendant. The negatives were developed. Defendant appeared in three of the photographs which were apparently a part of the photo array shown to Feifer in December by Officer Dooley.
Aside from Feifer's identification, there was other evidence linking defendant with the crime. There was testimony that defendant was a member of the Black Panther Party, or the Committee to Combat Fascism, a political splinter group of the Black Panther Party. Craig Jackson was also a member of that group. Good was not a member, but he attended some meetings and was a friend of Craig Jackson. Although there was conflicting testimony on the subject, the jury could have found that defendant was a "revolutionary" and had discussed killing the "pig," a pejorative term used to describe a police officer.
Willy Gaymon was a member of the group and helped defendant purchase a shotgun for $85 from Henry Glass either in the summer or fall of 1970. Glass confirmed that he sold Gaymon and defendant a shotgun in the summer of 1970. Gaymon told the police that after the purchase of the gun, defendant took it from Gaymon's apartment where it had been kept prior to the shooting. After taking the shotgun, defendant later told Gaymon that he sawed it off. Gaymon identified the shotgun at trial as looking almost like the shotgun they had purchased, except that the stock was no longer present and the barrel was cut down.
*515 After seeing a photo of the shotgun that was involved in the murder in 1970, Glass feared that his shotgun had been used, and contacted Gaymon, inquiring about defendant and the condition of the gun. Gaymon told him that defendant had left town. Glass testified that the shotgun, though modified, "could [have] very easily been the same one," and upon trying the mechanism of the gun, said it had a malfunction similar to the malfunction in the shotgun he sold.
Norman Ford was also a member of the Black Panther Party and knew the defendant.[2] On the day of the murder, Ford was at a bar with Craig Jackson. While at the bar, Ford and Jackson talked about robbing the Paddock Bar that evening. Later that evening, defendant came into the bar and sat down next to Ford. Defendant asked Ford about robbing the Paddock Bar, which prompted Jackson to state that he and Ford had already discussed the robbery. All three men then decided to do the robbery. Subsequent to that conversation, Ford began arguing with his girlfriend Cordelia Henry, who was also present, about Ford's participation in the robbery. Ford and Henry eventually left the bar together.
Pearline Robinson, who married Jackson on April 2, 1971, also testified at defendant's trial.[3] She testified that Jackson woke her up that evening and asked her to help him move Norman Ford's car. The car was parked near a bar on Atlantic Avenue, directly across the street from where Burke was murdered. After observing the scene, Jackson and Robinson drove off, and soon thereafter met defendant who was cradling a long object wrapped in cloth. The three then drove towards Baltic Avenue where Jackson *516 and defendant exited the vehicle. Defendant walked alongside a building and later returned without the object.
Defendant testified that he was a member of the Black Panther party but became disenchanted with the movement in August 1970 and left it. He denied meeting Ford and Jackson to discuss the robbery of the Paddock Bar. He testified that late in the evening of September 30, 1970 he left his apartment, stopped at a pool room and at Hope Davis's apartment.[4] He then proceeded to his father's apartment. Before arriving at his father's apartment, defendant was stopped, frisked and questioned by Detective Robinson.[5] After he left his father's apartment, several police officers and a car load of black people approached defendant concerning the murder. According to defendant, these events caused him to believe that he would be implicated because of his association with the Black Panther Party. He therefore decided to leave Atlantic City. When he later learned that he was a suspect, he went to Cuba.
Defendant ultimately decided to return to the United States. When he surrendered to the FBI in Miami, he was given his Miranda rights. Defendant denied shooting Officer Burke and maintained that he was framed.
After defendant was turned over to Officer Dooley and Officer Porcelli of the Atlantic City Police Department, he signed a rights form. The evidence in the case was then explained to him. Defendant was said to have remarked that the version made sense, that he did not want to say anything specific, and that he wanted to talk to someone. Defendant also said: "I've thought about all the things that you have said and I agree with your *517 opinions. I can almost guarantee you that the process will be a short one."
At trial, defendant explained that the statement given to the police was not intended to inculpate him. Rather, he meant to say that the extradition process to New Jersey would not take long because he would not fight it. Defendant also maintained that his statements were taken out of context.

I and II
Defendant's request for a Wade hearing was denied on the ground that he failed to demonstrate that the police impermissibly suggested to Feifer that she should pick out defendant's photographs from the array.[6] Defendant argues that the judge erred because the out-of-court identification made by Feifer was impermissibly suggestive and unreliable. Alternatively, defendant maintains that the in-court identification was improperly admitted because it was tainted by the out-of-court identification. A Wade hearing should be granted if defendant presents "some evidence of impermissible suggestiveness" in the identification process. State v. Rodriquez, 264 N.J. Super. 261, 269, 624 A.2d 605 (App.Div. 1993), aff'd o.b. 135 N.J. 3, 637 A.2d 914 (1994) (citing State v. Ortiz, 203 N.J. Super. 518, 522, 497 A.2d 552 (App.Div.), certif. denied, 102 N.J. 335, 508 A.2d 212 (1985)).
The first issue to be decided is whether the procedure utilized by the police was "in fact impermissibly suggestive." State v. Madison, 109 N.J. 223, 232, 536 A.2d 254 (1988). However, "[s]uggestiveness alone is not fatal." State v. Santoro, 229 N.J. Super. 501, 504, 552 A.2d 184 (App.Div. 1988). If suggestiveness is found, the second issue to be decided is whether the objectionable procedure resulted in a "very substantial likelihood of irreparable misidentification." State v. Madison, supra, 109 N.J. at 239, 536 A.2d 254 (quoting Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968)). *518 The essence of the second inquiry is reliability, that is, "whether the identification was prompted by the eye witness's own recollection of the crime or by the suggestive manner in which the identification procedure was conducted." State v. Santoro, supra, 229 N.J. Super. at 504, 552 A.2d 184.
Defendant argues that the identification procedures were impermissibly suggestive because Feifer initially identified Larry Good as the man who had been in the bar; the array of the forty-two photographs was never corroborated by both Feifer and Dooley; and defendant's photograph appeared several times, thus suggesting to Feifer that defendant, not Larry Good, was the true suspect.
The discrepancy between Feifer's and Dooley's testimony as to whether Feifer had actually seen forty-two photographs at one viewing is a matter of credibility, and does not preclude Feifer's ultimate identification testimony. As such, the issue, is one for the fact finder and does not trigger Wade. State v. Farrow, 61 N.J. 434, 451, 294 A.2d 873 (1972), cert. denied, 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973). The prior identification of Good in contrast with the subsequent and, according to Feifer, definitive identification of defendant, is also a question of credibility and weight for the fact finder to consider.
We also find no merit in defendant's contention that multiple photographs of the defendant presented in the array constitute impermissible suggestiveness. In State v. Rodriquez, supra, 264 N.J. Super. at 269, 624 A.2d 605, and State v. Gunter, 231 N.J. Super. 34, 40, 554 A.2d 1356 (App.Div.), certif. denied, 117 N.J. 80, 563 A.2d 841 (1989), this court held that the inclusion of multiple photographs of a defendant in an array was not unduly suggestive. Here, as in Gunter the photographs of the defendant were not the same, Feifer was not told that they were the same, and the police did not tell Feifer that she was tentatively identifying the same person. In addition, Feifer was never told by the police officers that the pictures depicted suspects in the murder case.
*519 All of the photographs shown to Feifer were black and white and all of them depicted black males of the approximate same age group and general physical appearance. Unfortunately, the police did not have mug shot photos of the defendant available for presentation. Thus, the police were constrained by circumstances to present unposed black and white photographs of the defendant. In two of the photographs defendant is depicted with others. The photographs of defendant were different from the other photographs in the array in that the pictures, though black and white, were clearly less formal. With the exception of the enlarged photograph showing Larry Good, the four photographs of the defendant stand out from the rest in terms of size and the appearance of informality. Thus, without imputing any improper motive to the police, we nonetheless conclude that the array was suggestive.
However, the failure to conduct a Wade hearing does not mandate a reversal. Although the trial judge in our view improperly concluded that the array was not suggestive, he nonetheless correctly recognized that the ultimate object of the inquiry was whether the identification was truly that of Feifer's or imposed upon her by the process. See United States v. Crews, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537, 547-548 (1980); Wade, supra, 388 U.S. at 240, 87 S.Ct. at 1939, 18 L.Ed.2d at 1149 (holding that clear and convincing evidence must be produced that the in court identification is based on the witness's independent opportunity to view the defendant at the time of the crime, and not because of the tainted identification procedures). The trial judge here made the decision on the question of reliability as recommended by the Supreme Court in State v. Madison, supra, 109 N.J. at 244, 536 A.2d 254. In our view he decided that issue correctly.
The absence of taint, or conversely the presence of reliability, must be determined from "the totality of the circumstances in the particular case." Id. at 239, 536 A.2d 254. Considering the evidence as a whole, certain factors are suggested for *520 particularized attention: 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty demonstrated at the time of the confrontation; and 5) the time between the crime and the confrontation. In analyzing these factors it must be remembered that the purpose of the inquiry is to determine whether the identification of the defendant was made by the witness because of the suggestiveness of the photographs, or as a result of her own independent recollection. Id. at 240, 536 A.2d 254. "The strength or credibility of the identification is not the issue on admissibility; that is a matter of weight, for the fact finder, under appropriate instructions from the trial judge." State v. Farrow, supra, 61 N.J. at 451, 294 A.2d 873.
In this case, Feifer was in defendant's presence for approximately five to six minutes in a well lit area. She took particular notice of defendant because of his suspicious behavior. Furthermore, there was no evidence that she was distracted by other work activities during this entire period of time. More importantly, as the trial judge pointed out, her attention to defendant is proven by the description she gave to the police artist. The sketch that was produced from her statement resembled defendant and prompted other individuals to conclude that it was defendant who was depicted. Further, she only identified Larry Good's photo when the photo had been altered with glasses and facial hair in order to resemble the man she had depicted in the sketch. Aside from the misidentification of Good, Feifer's identification of defendant remained consistent and steadfast. The sketch, of course, was prepared shortly after the murder, and the identification of the four photographs was accomplished no later than 2 1/2 months after the murder. Identifications of photographs after much longer periods of time have been sustained. Neil v. Biggers, 409 U.S. 188, 201, 93 S.Ct. 375, 383, 34 L.Ed.2d 401, 412 (1972) (seven months); State v. Miller, 202 Conn. 463, 522 A.2d 249, 254 (1987) (eight months).

*521 III
The State offered Norman Ford's testimony in order to prove that defendant was involved in a conspiracy to rob the Paddock Bar on the night of the murder, thereby creating the inference that defendant would have a reason to be at the location where the murder occurred. Defendant maintains that it was error to do so.
The hearsay statements made by Jackson and defendant to Ford were admissible if they were made in furtherance of or in the course of a conspiracy, and if there is independent evidence of the conspiracy and of the defendant's participation in it. State v. Phelps, 96 N.J. 500, 508-510, 476 A.2d 1199 (1984). Furthermore, the statements are admissible notwithstanding the fact that the goals of the conspiracy were frustrated. State v. La Fera, 35 N.J. 75, 86, 171 A.2d 311 (1961).
Contrary to defendant's argument, Ford's testimony was relevant because it proved that defendant was involved in a conspiracy that would have placed him at the Paddock Bar that evening. The conversation between Ford and Jackson furthered the conspiracy and was made during the conspiracy inasmuch as the statements established how the robbery was to take place. Ford's testimony also placed defendant at the initial stages of the conspiracy, when the plan was formed. Under the co-conspirator exception, Ford's testimony clearly fits within Phelps because the statements made by Jackson and Ford implicated defendant based on his subsequent conduct.
Interestingly, defendant does not dispute that independent proof of the conspiracy existed. Feifer's testimony corroborates Ford's in that defendant entered the Paddock Bar and engaged in conduct that would reasonably lead one to conclude that he and his companion were casing the bar for a robbery. Further, defendant's possession of the bag, and the concealment of the bag with his overcoat, are additional facts that support a reasonable conclusion that a robbery was being planned.
*522 The State offered the conspiracy evidence in order to place defendant at the scene of the shooting and assist the jury on the "issue of identity." As such, defendant maintains that the evidence was inadmissible "other crimes" evidence, and, if admissible, required a limiting instruction. We disagree with defendant's contentions.
Evid.R. 55, now, N.J.R.E. 404(b), does not apply when the "other crimes" evidence is part of the total criminal conduct that occurred during the incident in question and may be considered within the res gestae of the charged crime. State v. Ortiz, 253 N.J. Super. 239, 243, 601 A.2d 735 (App.Div.), certif. denied, 130 N.J. 6, 611 A.2d 646 (1992). Nor does the Rule apply to uncharged acts of misconduct that are components of the subject matter crime. State v. Martini, 131 N.J. 176, 241, 619 A.2d 1208 (1993), post conviction relief denied, 139 N.J. 3, 651 A.2d 949 (1994), cert. denied, ___ U.S. ___, 116 S.Ct. 203, 133 L.Ed.2d 137 (1995). Evidence of events that take place during the same time frame as the crime charged in the indictment will not be excluded if the evidence establishes the context of the criminal event, explains the nature of, or presents the full picture of the crime to the jury. State v. Louf, 64 N.J. 172, 178, 313 A.2d 793 (1973). A jury "cannot be expected to make its decision in a void  without knowledge of the time, place and circumstances of the acts which form the basis of the charge." United States v. Masters, 622 F.2d 83, 86 (4th Cir.1980). Because the evidence was not "other crimes" evidence, the requirement that a limiting instruction be given when "other crimes" evidence is used is inapplicable. Therefore, the trial judge did not err in admitting the evidence, nor in failing to instruct the jury as to its limited relevance.

IV
The State offered Robinson's testimony to show that Jackson and defendant had conspired to conceal evidence of the murder, specifically the shotgun. Her testimony was also used to show that Jackson and defendant had conspired to avoid apprehension *523 when Jackson directed Robinson to serve as his alibi, and when defendant fled to Cuba. Defendant argues that no conspiracy to conceal evidence existed, and if it did, defendant did not participate in it.
As previously stated, a co-conspirator's statement is admissible if the statement was made in furtherance of and during the course of the conspiracy. Phelps, supra, 96 N.J. at 508-10, 476 A.2d 1199. Further, there must be independent evidence of the conspiracy and of the defendant's relationship to it. Ibid. Defendant argues that the first two steps were not met, but appears to concede the third.
The conspiracy continues until the object of the conspiracy is fulfilled, or proof exists that a member has withdrawn from the conspiracy. State v. Farinella, 150 N.J. Super. 61, 67, 374 A.2d 1229 (App.Div.), certif. denied, 75 N.J. 17, 379 A.2d 248 (1977). No proof was offered at the Rule 8 hearing to show that defendant withdrew from the conspiracy. Indeed, the argument was never raised, and it can be inferred from this record that the conspiracy continued until defendant arrived in Cuba. That notwithstanding, Jackson's participation did not terminate until after he explained Robinson's alibi role to her. At that point in time his scheme to conceal himself from apprehension and prosecution was complete. However, up to that point, his statements and conduct were attributable to defendant as a co-conspirator. As noted, the statements by Jackson to Robinson obviously furthered the conspiracy because they sought to shield Jackson, and, in turn, defendant from prosecution by establishing a plan to prevent detection. The goals of the conspiracy were carried out as Jackson's alibi removed him from participation in the murder. In turn, the alibi would protect defendant because Jackson and he would not be associated together on that night. First, Jackson had Robinson accompany him to move Ford's car that was directly across from the Paddock Bar. Second, they picked up defendant, Jackson and defendant talked, and then defendant hid the object *524 he was carrying. Next, defendant was dropped off and then Jackson advised Robinson how she was to serve as his alibi.

V and VI
Defendant contends that the trial judge improperly admitted Hope Davis's written statement to the police as a prior inconsistent statement, and further alleges that the circumstances surrounding the prior inconsistent statement failed to establish its reliability. State v. Gross (Anthony), 121 N.J. 1, 9, 577 A.2d 806 (1990).
Davis admitted giving a statement to the police in December 1970, two weeks after delivering a baby fathered by defendant. She maintained that her oral statement to the police was the truth, but when the police returned with the written statement for her signature (which she signed without reading it), the statement contained facts that were not true. At trial, she testified that she could not remember any of the facts contained in the statement, nor could she remember that she talked to defendant on October 2, 1970 when she was instructed to obtain suitcases from his father for the purpose of taking them to New York. She also testified that defendant never discussed killing police officers with her, and that the statements in the report to the contrary were untrue. She characterized defendant as quiet and non-violent.
The trial judge conducted a hearing under former Evid.R. 8, now N.J.R.E. 104(a), because the State wanted to offer her statement as a prior inconsistent statement. Inspector Kane testified for the State in that respect. Kane testified that the statement began in the apartment where Davis was staying, but when he realized that a formal statement was needed, Davis accompanied him to headquarters. At that time, Davis never expressed any hostility toward the police, a desire not to give a statement, or an inability to remember the events surrounding the murder. Though not a suspect, Davis was given Miranda rights and never requested the presence of an attorney. Questions were asked by Kane and two other police officers who were also *525 present. Davis initialed and signed all eight pages of the statement. Her signature was notarized.
The trial judge ruled that her trial testimony was inconsistent because she answered questions with "I don't recall" where that response was plausible and non-incriminating, but answered in the negative when the response would have seriously incriminated defendant. The judge found that the circumstances surrounding the 1970 statement made the statement reliable because Davis had no motive to fabricate, her statement was substantially corroborated, she was not under arrest, and she was not coerced or threatened. Therefore, he held the statement was admissible under Evid.R. 63(1)(a), now N.J.R.E. 804.
Defendant appears to challenge the written statement only as to its reliability. The party seeking admission of the statement must prove its reliability by a fair preponderance of the evidence. A. Gross, supra, 121 N.J. at 16, 577 A.2d 806. The fact that the witness inculpates defendant is merely one of several circumstances to be considered in the admission of the statement into evidence. State v. Gross (Frank), 121 N.J. 18, 28-9, 577 A.2d 814 (1990). In A. Gross, supra, the court identified fifteen relevant factors in determining reliability. 121 N.J. at 10, 577 A.2d 806 (quoting State v. A. Gross, 216 N.J. Super. 98, 109-10, 523 A.2d 215 (App.Div. 1987)). The factors that are relevant to this case were satisfied.
Davis's statement evidenced her close connection to, and interest in the matter. A. Gross, supra, 121 N.J. at 10, 577 A.2d 806. The witness was pregnant with defendant's child at the time she gave her statement. Davis disclosed that defendant asked her to obtain his suitcase and send it to New York. Further, Davis noted that defendant desired to kill a police officer and that "he had a feeling that he would have accomplished something if he did something like that." Thus, the close relationship between defendant and Davis at the time the statement was given, enhanced the reliability of Davis's statement.
*526 The place, occasion, and circumstances surrounding the offering of Davis's statement corroborated its reliability. Inspector Kane began the interview at Davis's home. Although Davis gave birth only two weeks earlier, there was no indication that she was suffering from any ill effects from the recent birth. Further, Inspector Kane asked open-ended questions that Davis answered in a responsive, detailed, and spontaneous manner. There was no evidence of threats or enticements for her to give the statement that was given. Assuming that the police properly recorded the questions and answers given, there was no motive on Davis's part to fabricate.
Further, there is substantial trial testimony to corroborate Davis's statement. William Gaymon testified that defendant often spoke of obtaining guns and killing policemen. Second, Antoinette Nedd, Davis's longtime friend, testified that she helped Davis pick up a suitcase from the home of defendant's father and check it through to New York at an Atlantic City bus station.
Defendant further contends that Davis's failure to testify at the Evid.R. 8 hearing rendered the hearing incomplete. There is no New Jersey case that supports defendant's argument. We note that case law in other jurisdictions requires it. State v. Dexter, 269 N.W.2d 721 (Minn. 1978); People v. Loyd, 71 Cal. App.3d Supp. 1, 139 Cal. Rptr. 693 (1977). However, even if we were to assume error in this regard, the error was harmless. Defendant had a full and fair opportunity to examine and cross-examine Davis in the presence of the jury both on the issue of admissibility and reliability. A. Gross, supra, 121 N.J. at 15, 577 A.2d 806. Defendant fails to exhibit how Davis's testimony out of the hearing of the jury would have been any different. Therefore, we find no error on these points.

VII
Defendant raises for the first time on appeal the argument that remarks made by the prosecutor in the opening statement, the direct examination of two police officers, and the closing statement *527 relative to defendant's political association with the Black Panther Party denied defendant a right to a fair trial.
As to the arguments of the prosecutor, the defendant's failure to object gives rise to the inference that he did not find the prosecutor's remarks to have crossed the bounds of permissible advocacy when they were made. State v. Darrian, 255 N.J. Super. 435, 605 A.2d 716 (App.Div.) certif. denied, 130 N.J. 13, 611 A.2d 651 (1992). Consequently, reversal is warranted only if defendant can show that the remarks constitute plain error clearly capable of producing an unjust result. State v. Zola, 112 N.J. 384, 427, 548 A.2d 1022 (1986), cert. denied, 489 U.S. 1022, 109 S.Ct. 1146, 103 L.Ed.2d 205 (1989). The same can be said with respect to the evidentiary matters for which there was no objection. State v. Macon, 57 N.J. 325, 273 A.2d 1 (1971); R. 2:10-2.
In respect of the prosecutor's remarks in the opening and closing statements, any deviation from perfection "must be clear and unmistakable and must substantially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense." State v. Bucanis, 26 N.J. 45, 56, 138 A.2d 739 (1958), cert. denied, 357 U.S. 910, 78 S.Ct. 1157, 2 L.Ed.2d 1160 (1958). A prosecutor's opening statement, for example, may introduce a wide range of permissible evidence to establish motive. State v. Carter, 91 N.J. 86, 102, 449 A.2d 1280 (1982). "Evidence of motive may be admissible even though it may be prejudicial in the sense that it will arouse or inflame the jury against defendant." Ibid. "A wider range of evidence is admissible to establish motive or intent than is permitted in support of other issues." State v. Crumb, 277 N.J. Super. 311, 317, 649 A.2d 879 (App.Div. 1994).
In the present case, evidence concerning the anti-establishment philosophy of the Black Panther Party, coupled with defendant's own express hatred of the police, provided evidence of defendant's motive to kill Officer Burke. The evidence introduced on that subject properly outlined the underlying reasons behind *528 the defendant's alleged actions. The probative value of such evidence outweighed the risks of an adversely affected jury and prejudice to the defendant. In many respects this case is not unlike State v. Carter, 91 N.J. 86, 449 A.2d 1280 (1982), in which similar statements were made that, although inflammatory, were found appropriate on the issue of motive. See also Crumb, 277 N.J. Super. at 317, 649 A.2d 879 (holding that the probative value of written material seized from defendant, a white person, which evidenced defendant's hatred and death wish for black people, outweighed any danger of unfair prejudice from such inflammatory materials). Further, with respect to the evidence offered on the subject, the trial judge is vested with the final authority to determine if the prejudice of the evidence outweighs its probative value. Evid.R. 4, now N.J.R.E. 403. We may reverse on such issues only if the trial judge's decision "was so wide of the mark that a manifest denial of justice resulted." Carter, supra, 91 N.J. at 106, 449 A.2d 1280. Our review of the record satisfies us that there was no such abuse of discretion. Finally, considering the relevancy of the motive evidence in this case, we conclude that the prosecutor's summation did not exceed the bounds of propriety, and, therefore, did not deprive defendant of a fair trial. State v. Ramseur, 106 N.J. 123, 322, 524 A.2d 188 (1987).

VIII
Defendant contends that the trial judge erroneously charged the jury on the element of intent in respect of N.J.S.A. 2A:113-1 and N.J.S.A. 2A:113-2. He contends that, in view of the testimony during the trial concerning his political association with the Black Panther Party, the judge was required to include in the intent charge an instruction on the rights to free speech and assembly under the First Amendment. It does not appear that this issue was raised below, although defendant does not alert us to that problem in his brief. R. 2:6-1(a)(1).
In any event, the argument is without merit. The trial judge is required to instruct the jury only as to the essential *529 elements of the crime. State v. Green, 86 N.J. 281, 287, 430 A.2d 914 (1981); State v. Whitted, 232 N.J. Super. 384, 391, 557 A.2d 327 (App.Div. 1989). Intent is an element of the crime of murder, and the jury was properly instructed as to that element. Defendant's argument really addresses the issue of motive which, although relevant to the issue of intent, is not an essential element of the crime of murder. State v. Beard, 16 N.J. 50, 60-61, 106 A.2d 265 (1954). Defendant's First Amendment rights were not the focal point of the prosecution. It was not his association or speech that was criminalized by the prosecution, but rather his intent to commit murder. As such, the prosecution did not curtail his First Amendment liberties. Wayte v. United States, 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985).

IX
Defendant argues that the judge failed to instruct the jury that the killing of a police officer in the execution of his duties under N.J.S.A. 2A:113-2 is second degree murder if the defendant only intended to do bodily harm. This argument is also raised for the first time on appeal, although defendant does not note it in his brief. R. 2:6-1(a)(1).
In State v. Thomas, 76 N.J. 344, 387 A.2d 1187 (1978), the Supreme Court stated that the murder of a police officer does not automatically trigger first degree murder. Id. at 355, 387 A.2d 1187. The Court stated "[i]f the intent is to do bodily harm, the offense remains murder in the second degree, and this, as we said, whether the intended harm is grievous or less than grievous." Id. at 355-366, 387 A.2d 1187 (quoting State v. Madden, 61 N.J. 377, 389-90, 294 A.2d 609 (1972)).
We find it difficult to imagine, in light of the place and nature of Officer Burke's wound, how a rational jury could conclude that the shooter's intent was other than to kill. In any event, we believe the instructions as a whole satisfactorily conveyed the concept of State v. Thomas to the jury. State v. Ramseur, supra, 106 N.J. at 280, 524 A.2d 188. The judge made a clear distinction between *530 first and second degree murder, and between intent to kill and intent to cause bodily harm. Specifically, in respect of the charge on count two, the judge made it clear that if the State failed to prove an intent to kill the police officer, a second degree murder was the result. When considered in light of the judge's charge with respect to count one, the jury knew that if there was no intent to kill, but only to cause grievous bodily harm, second degree murder was the appropriate finding. Thus, we find no error, no less plain error in these circumstances.

X
Defendant argues that the State failed to prove that the victim was in the execution of his duty, and that the trial court erred when it charged first degree murder in light of that failure. This issue also is raised for the first time on appeal without appropriate designation in defendant's brief. R. 2:6-1(a)(1). The issue is clearly without merit. There is more than sufficient evidence in the record from which a fact finder could conclude that Officer Burke was in the execution of his duty at the time of the murder. R. 2:11-3(e)(2).

XI
We have carefully reviewed the arguments presented in defendant's pro se appellate brief and conclude that, except as to those issues which may overlap the issues raised by appellate counsel previously addressed, the arguments are without merit and do not warrant separate discussion. However, with respect to defendant's claim that he received ineffective assistance of counsel, we specifically do not address that issue in light of State v. Preciose, 129 N.J. 451, 462, 609 A.2d 1280 (1992). In view of the fact that many of the issues presented by defendant may implicate defense counsel's strategy, the issue may be better left to a post conviction relief hearing should defendant elect to move for such a hearing rather than have the issue fragmented and decided piecemeal.
In all other respects, the judgment under review is affirmed.
NOTES
[1] Kravitz died before the trial, but his statement was admitted over objection as an excited utterance, an exception to the hearsay rule.
[2] Ford testified at Craig Jackson's trial in 1971, and was held in contempt because he refused to testify against Jackson, who was his friend. He stated that he decided to testify in this case because it was the truth, the officer should not have been killed, and he no longer had to protect Jackson.
[3] Robinson also testified at Jackson's trial. She admitted that she conformed her testimony at that trial to coincide with what Jackson told her. However she stated that she was testifying truthfully at defendant's trial.
[4] Davis was defendant's girlfriend who he met through the Black Panther Party in late 1969 or early 1970. She gave birth to their child on November 20, 1970.
[5] Detective Robinson died before the trial. Officer Ben Polk, who was Detective Robinson's partner at the time, testified that he was with Robinson the entire evening and he never saw defendant.
[6] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).