922 A.2d 844 (2007)
393 N.J. Super. 159
STATE of New Jersey, Plaintiff-Respondent/Cross-Appellant,
v.
William J. BURDEN, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted April 16, 2007.
Decided May 18, 2007.
*845 Yvonne Smith Segars, Public Defender, for appellant/cross-respondent (Gilbert G. Miller, Designated Counsel, of counsel and on the brief).
Stuart Rabner, Attorney General, for respondent/cross-appellant (Daniel I. Bornstein, Deputy Attorney General, of counsel and on the brief).
Before Judges S.L. REISNER, SELTZER and C.L. MINIMAN.
The opinion of the court was delivered by
S.L. REISNER, J.A.D.
Defendant William Burden appeals from his convictions for third-degree attempted burglary, contrary to N.J.S.A. 2C:5-1 and N.J.S.A. 2C:18-2; second-degree conspiracy to commit robbery, contrary to N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a; third-degree unlawful possession of an assault firearm, contrary to N.J.S.A. 2C:39-5f; and fourth-degree obstruction of justice, contrary to N.J.S.A. 2C:29-1. He also appeals from his aggregate extended term sentence of twenty years in prison, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The State cross-appeals from the merger of the two weapons offenses. We affirm the convictions on all charges, reverse the merger of the weapons convictions, and remand for reconsideration of the sentence.
We have determined to publish only that portion of our opinion addressing Burden's argument that N.J.R.E. 404(b) applies to evidence that he attempted to bribe a witness.[1]

I
This case arose from an alleged attempted burglary and armed robbery at the home of Tameka Clayton. According to her trial testimony, on November 21, 2001, at 11:30 p.m., Clayton was in her apartment located at the rear of 63 West Broadway in Salem, New Jersey. The lights were on in the living room and in her bedroom, and television sets were on in her brother's and son's rooms. Her son, who was age four or five at the time, "busted" into Clayton's bedroom, "[k]ind of scared but calm," and reported something that made her first go check on her paralyzed brother, and then go to her son's room to look out the window. Clayton *846 testified that she then "went back to my room to cut the circuit breaker off" after seeing "a couple people out the window . . . on the side of the house."
Clayton called the police "and said somebody's trying to break in." She saw "four or five" people and when she "lift[ed] the window up they started walking off so I went to my back door and that's when the police came, and they started running, and they jumped over the fence into Westside Court." At trial she testified that before the police arrived, one of the people "asked could he come in," and another responded "[s]he know me, come on" as if to urge the original speaker to leave. She was not able to identify any of these individuals by sight, but testified the second voice she heard outside (urging the others to "come on") was Burden's, a fact she had not immediately reported to the police. According to Clayton, she knew Burden as "G-Money,"[2] "[f]rom when he used to come to my house on [63 West] Broadway." She testified that he was welcome in her home, came there "a lot" and that she knew him both by sight and voice.
Clayton admitted that she did not tell the police that she recognized Burden's voice until two years after the incident, around the time she was indicted on drug charges. She insisted, however, that she was not promised any favorable treatment in return for identifying Burden.
According to both Clayton and police witnesses, immediately after the incident an inspection of Clayton's apartment windows revealed that a "screen was off" one of the windows, a condition which she testified had not previously existed in the four years she had lived there. In fact she testified that she had looked out her son's window earlier that night, and the screen was in place.
Officer Delapaz testified that he "was dispatched for a prowler complaint" to Clayton's address, and was "the first one on the scene." He "circled the perimeter around to the house," encountered Clayton at the back of the building and was talking to her when he
heard some noise coming from the west side of the house where there was a chain link fence. I looked over to the left side of the house past the chain link fence and I saw three subjects in dark clothing running south on, past the house towards the chain link fence.
. . . .
As soon as I saw what was going on . . . I just got on the radio, let the other officers know . . . [t]here were three subjects running towards the fence which is connected to the West Side Court property, jumped the fence and where they were running.
Upon receiving the report of an attempted burglary or prowler at 63 West Broadway, and Patrolman Delapaz's update "that the suspects had jumped the fence and ran into Westside Court," Patrolman Robinson went directly to Westside Court. While there he observed "two black males running towards me . . . and then they changed direction." The men were running from the direction of "a set of dumpsters . . . approximately ten to fifteen feet" from the fence behind Clayton's residence. Robinson "ordered them to stop, and they continued to run so [he] pursued them on foot," while other officers were also "engaged in the pursuit." Four suspects were caught, arrested and handcuffed, then brought to police headquarters.[3]
*847 Robinson was then "re-dispatched to the scene" and retraced the suspects' steps to a dumpster in which he "found a Mack 11 automatic weapon and a loaded magazine." Because the gun and ammo clip were dry when found at the scene, whereas the dumpster and its other contents were wet with condensation, Detective Schaffer testified that "that weapon [had] recently been placed in that container because there was no condensation nor rust." The weapon and ammunition went through forensic examinations for fingerprints, but "[n]o readable latent prints were found."
Detective Schaffer interviewed the four individuals taken into custody that night, after all were read their Miranda[4] rights. He testified that "[t]hree individuals didn't wish to make any taped statements or any comments" but one individual, who identified himself as Jermaine Jefferson, did give a handwritten, signed statement in Schaffer's presence.
Approximately two years after his arrest, while awaiting trial, defendant attempted to engage in witness tampering during a telephone call he made from the Salem County jail. Burden called a friend, Marcus "Smooth" Thompkins, and induced Thompkins to call Clayton on another phone. Then, with Thompkins on the phone to Clayton, Burden coached Thompkins to make Clayton an offer of money to refrain from testifying. His attempt was discovered because the jail recorded all such outgoing calls, on notice to the inmates. According to Clayton, on September 7, 2003, while hospitalized for kidney problems, she received a telephone call in her hospital room from an unknown person, who offered her $200 if she would not testify against Burden. When a tape of the call recorded at the jail was played for her, she recognized Burden's voice coaching the person who called her. The tape was played for the jury at the conclusion of Clayton's direct testimony, after both parties stipulated to the recording's authenticity. In his trial testimony, Burden admitted that he offered Clayton money not to testify against him.
The prosecution also presented testimony from the one co-defendant who had cooperated with the State. This witness had, at all times from his arrest to his direct testimony at trial, identified himself as Jermaine Jefferson. Jefferson testified that he "got locked up" on November 21, 2001, for "[a]ttempting to take some money." The attempt was the result of an agreement between Jefferson, Burden, whom he knew only as "G-Money," and two other men, to commit a home invasion in Salem. He recalled that the four men stopped in Vineland, New Jersey on their way to Salem "to get the gun," an idea he claimed was Burden's. He stated that Burden got the gun and showed it to him, and that he was "aware that there was going to be a gun involved in this attempted break-in . . . [to m]ake the job easy. . . . Usually when people see a gun, they tend to give up the money." Jefferson said he "expect[ed] to find people in the house" they were to rob, and described the gun to be used as "a little MAC, little MAC 11 machine gun." He identified the gun and ammunition entered into evidence by the prosecution as that which Burden possessed the night of the incident.
Jefferson recalled that when the car carrying the group stopped in Salem, "we had to use the bathroom. So we . . . did that and [the] lady had came to the window, mentioned something. Somebody got into, words was exchanged and pretty *848 much what happened." He claimed he did not remember who exchanged words with Clayton and that Burden had the gun "on his person" during the incident. He recalled that after going to the bathroom "by the side of the house" the group was attempting "[t]o go in" the house through a door, but when asked if they were "successful in your attempt to gain access to that house," he responded, "No, we never attempted to go in . . . [because c]ops came from everywhere." Jefferson recalled that when the police arrived "we all ran our separate ways . . . we just, we all split up." He admitted to climbing the fence bordering Clayton's property. He stated he did not see what Burden did with the gun after the police arrived.
. . . .
At trial, Burden testified that on the night of the incident, he came to Salem from Philadelphia with "Jermaine Jefferson, Wayne Jefferson, Billy Dee Jones, and Clarence Cantie" in Cantie's vehicle "to see some girls." He testified that though he knew residents of 63 West Broadway, that was not the group's intended destination, but rather they stopped there "to urinate" after their long ride from Philadelphia. He testified that he did not know Clayton but he did know the brother who lived with her, from when they played basketball together.
Burden testified that while his group was urinating outside the building, "somebody came to the window and it was Tameka Clayton and she said . . . what are you all doing out there[.]" He claimed that "we wasn't even on their property . . . but you could see a window [of Clayton's apartment] from there." He denied saying "she know me" while outside the building, but recalled her saying "I'm calling the police" when one of his companions responded to her. Because he "had a warrant for a traffic ticket . . . I just ran" when he heard the patrol car arrive. He admitted on cross-examination to jumping over the fence behind Clayton's building, but denied seeing any dumpsters on the other side of that fence. He insisted he was walking not running when he encountered the police on Westside Court, and explained to the police he had just come from urinating. The police responded by placing him under arrest and taking him to the station.
Burden insisted that "[n]o one [in his group] tried to enter [Clayton's] home." He also denied touching the screen on her window and explained, "You can't touch the window. . . . No way you can touch the window. You need a ladder to even touch that window." He also denied having a gun with him, or seeing anyone else with "a gun that night." Specifically, he denied ever seeing the gun and ammunition placed in evidence by the prosecution before being "at the police station," and on cross-examination denied getting the gun that night "from Vineland" or even going to Vineland at all. Finally, he denied that he "and any of the people there ever had any decision to commit a robbery."
Burden admitted to two prior convictions, a third-degree offense in 1994 and a second-degree offense in 1996, and the sentences he received, but claimed he had "put all that behind me." He insisted that he "never committed a crime that night, never  me and her brother is friends. I never  why would I commit a crime? I never tried to commit a crime." He did however admit having Marcus "Smooth" Thompkins call Clayton in 2003 to address her claim that she had recognized Burden's voice on the night of the incident. He admitted that the tape-recording of this call, played in court, included his voice and he attempted to explain why he contacted Clayton:

*849 In 2003 she come up with this statement saying that she heard my voice . . . I had not been involved with this crime. So I'm like I keep steady coming to court from the street, taking off work, coming in here, and they offer me all this time about this crime, and I never committed a crime, and . . . it was getting worser and worser every time I came in here. So, my thing was, well, if I could resolve it, you know, through her and give her, you know a couple hundred dollars and just be done with it . . . [I]f she never made up a new testimony I would have never offered her any money, but when she made up her new testimony I seen that it was damaging to me. She was trying to jam me up, and that's when I came up with offering her a couple hundred dollars.
. . . .
I didn't think it was illegal at all, because if I thought it was illegal I would have never said I'm going to get you to sign something for my lawyer. . . . I wanted her to sign something so I could have it present for my lawyer just in case she changed her mind about any testimony that she's supposed to give. (Emphasis added.)
. . . .
Burden admitted upon questioning that when Thompkins made the call to Clayton, Burden was "[i]n Salem County Jail" but he denied that he ever "said I was at work when I made the call."
. . . .

II
On this appeal, Burden raises the following issues:
POINT I: DEFENDANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND FUNDAMENTAL FAIRNESS UNDER THE NEW JERSEY CONSTITUTION AND HIS FEDERAL AND STATE CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM BY THE STATE'S FAILURE TO DISCLOSE THE TRUE IDENTITY AND CRIMINAL HISTORY OF WAYNE "WIZ" JEFFERSON.
POINT II: DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO EFFECTIVE CROSS-EXAMINATION AND TO PRESENT A COMPLETE DEFENSE.
POINT III: THE JURY INSTRUCTIONS WERE DEFICIENT IN MULTIPLE RESPECTS. (Not Raised Below).
POINT IV: THE PROSECUTOR DEPRIVED DEFENDANT OF A FAIR TRIAL BY ASKING HIM QUESTIONS ON CROSS-EXAMINATION WHICH ELICITED THAT HE WAS INCARCERATED.
POINT V: IMPROPER TESTIMONY COMMENTING UPON DEFENDANT'S EXERCISE OF HIS RIGHT AGAINST SELF-INCRIMINATION WAS ADMITTED IN VIOLATION OF DEFENDANT'S CONSTITUTIONAL RIGHTS. (Not Raised Below).
POINT VI: DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT [SY] A SPEEDY TRIAL.
POINT VII: CUMULATIVE ERROR IN THIS MATTER REQUIRES THE REVERSAL OF DEFENDANT'S CONVICTIONS AND A NEW TRIAL.
POINT VIII: DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE.
POINT IX: DEFENDANT'S 20 YEAR SENTENCE, WHICH EXCEEDED THE THEN-EFFECTIVE PRESUMPTIVE EXTENDED TERM FOR DEFENDANT'S SECOND DEGREE CONVICTION FOR CONSPIRACY *850 TO COMMIT ROBBERY BY FIVE YEARS, WAS UNCONSTITUTIONAL.
[The court's discussion of Points I, II and IV through IX has been omitted at the court's direction]
We next address defendant's claim that the jury should have been given a charge concerning consideration of other bad acts, under N.J.R.E. 404(b), and State v. Cofield, 127 N.J. 328, 341-42, 605 A.2d 230 (1992), to assist them in properly weighing evidence of defendant's attempted witness tampering. We recognize that the evidence of Burden's attempt to bribe Clayton not to testify against him, and his later conversation with Jefferson in a courthouse hallway,[5] might be viewed as part of the res gestae. N.J.R.E. 404(b) "prohibits the introduction of evidence of past acts of misconduct as a basis for an inference that defendant committed the acts for which he or she is then standing trial." State v. Martini, 131 N.J. 176, 240, 619 A.2d 1208 (1993), overruled in part on other grounds, State v. Fortin, 178 N.J. 540, 647, 843 A.2d 974 (2004). In other words the jury may not infer that defendant has a general propensity to commit crimes because he committed other bad acts. On the other hand, where the alleged bad act is part of the full picture of the crime charged it has sometimes been considered res gestae evidence to which N.J.R.E. 404(b) is not applicable.
"Other crimes" evidence which relates directly to the crimes for which the defendant is on trial is admissible if it "serves to paint a complete picture of the relevant criminal transaction," "`furnishes part of the context of the crime,'" or "`is necessary to a full presentation of the case.'" State v. Martini, 131 N.J. 176, 242, 619 A.2d 1208 (1993) (quoting United States v. Masters, 622 F.2d 83, 86 (4th Cir.1980)). In Martini, the Court found it "ridiculous" to conclude that the State should be prevented from showing that the defendant had driven the victim's stolen car to the diner to pick up his ransom and had threatened her simply because he was not charged with those crimes. Ibid. This type of evidence may be considered within the res gestae of the charged crimes. State v. Cherry, 289 N.J.Super. 503, 522, 674 A.2d 589 (App.Div.1995). No limiting instruction is necessary when the "other crimes" evidence was related to the res gestae. Martini, supra, 131 N.J. at 242, 619 A.2d 1208. [State v. Torres, 313 N.J.Super. 129, 160-61, 713 A.2d 1 (App.Div.), certif. denied, 156 N.J. 425, 719 A.2d 1023 (1998).]
In this case, although the witness tampering occurred two years after the crime, it might be argued that the undisputed evidence of Burden's attempt to bribe Clayton into refusing to testify was directly related to the original crime which he was charged, since it was an attempt to conceal that crime. See Cherry, supra, 289 N.J.Super. at 522, 674 A.2d 589; State v. Pierro, 355 N.J.Super. 109, 117-18, 809 A.2d 804 (App.Div.2002), certif. denied, 175 N.J. 434, 815 A.2d 479 (2003).
We conclude, however, that the res gestae arguments are foreclosed by the Supreme Court's recent decision in State v. Williams, 190 N.J. 114, 919 A.2d 90 (2007). In Williams, the defendant shot a driver hired to transport defendant and his guests to defendant's house. Immediately after the shooting, defendant attempted to *851 cover it up by asking witnesses to lie about what happened and by tampering with evidence to make it appear that the shooting was a suicide. At his first trial the post-shooting conduct was admitted "with a limiting instruction." Id. at 121, 919 A.2d 90. Defendant was convicted of all charges relating to his post-shooting conduct, including hindering apprehension, tampering with evidence and witness tampering. Id. at 117, 919 A.2d 90. He was acquitted of aggravated manslaughter and aggravated assault, but the jury deadlocked on the reckless manslaughter charge. Id. at 117-18, 919 A.2d 90. Prior to a re-trial on the reckless manslaughter charge only, the trial court ruled that the State could not introduce evidence of Williams' post-shooting conduct to prove consciousness of guilt. Id. at 117-18, 919 A.2d 90. We affirmed on leave granted; the Supreme Court granted leave to appeal on the admissibility of the post-shooting conduct, and reversed. Id. at 118, 919 A.2d 90.
Significantly, the Court's opinion states that "[t]he admissibility of that other-crimes evidence is governed by Evidence Rule 404(b), as the trial court and the Appellate Division correctly understood." Id. at 121-22, 919 A.2d 90. Analyzing the evidence under the test set forth in Cofield, supra, the Court concluded that the evidence was admissible under N.J.R.E. 404(b), because it was relevant as "classic consciousness of guilt evidence." Williams, supra, at 129, 919 A.2d 90. The Court also concluded that the second Cofield prong, "requiring that the `other acts' be similar in kind and reasonably close in time," was not applicable to consciousness of guilt evidence. Id. at 131, 919 A.2d 90. And since defendant had been convicted there was no issue as to the clear and convincing proof of the other crime. Ibid. Further, in weighing the possible prejudicial effect as opposed to the probative value of the evidence, the Court recognized that "[t]here is no risk that a jury hearing this other-crimes evidence will confuse it as exhibiting defendant's predisposition to commit a certain type of like crime." Id. at 133 n. 9, 919 A.2d 90. Therefore the Court concluded that the evidence should be admissible. Id. at 133-34, 919 A.2d 90. However, the trial court must give a limiting instruction to the jury, directing that "the evidence may be used only to assess defendant's mental state" and that the jury "should not draw any inference of consciousness of guilt by defendant from his post-crime conduct unless it believes that defendant acted to cover up a crime." Id. at 133-34, 919 A.2d 90.
The Court's opinion does not indicate whether the State argued that the post-shooting conduct might be considered part of the res gestae and thus not subject to the requirement of a limiting instruction under Cofield. However, our unreported opinion indicates that the State raised precisely that argument and we rejected it. State v. Williams, No. A-2724-04; A-3939-04; A-2725-04; A-2726-04; A-2727-04, 2005 WL 3968822at *5 (App.Div. Apr. 21, 2006). We are bound by the Court's clear and unequivocal statement that the post-shooting cover-up evidence must be analyzed under Evidence Rule 404(b) and that a limiting instruction is required. Williams, supra, 190 N.J. at 129, 133-34, 919 A.2d 90.
Our N.J.R.E. 404(b) analysis of Burden's admitted attempt to bribe Clayton into silence mirrors that of the Court in Williams. The evidence is highly relevant to Burden's consciousness of guilt. His telephone call was tape-recorded by the jail, and he admitted to it at trial. As in Williams, this is not evidence of a crime similar to the one Burden was charged with, thus greatly attenuating the risk that the jury would conclude that it was evidence of Burden's predisposition to commit *852 the type of crime with which he was charged. We conclude that "[t]he evidence's use for state of mind purposes is permitted under Rule 404(b) and any prejudicial concern about predisposition is outweighed by probative value of the evidence." Id. at 133, 919 A.2d 90.
Moreover, we conclude that the trial court's failure to sua sponte give the jury a limiting instruction under Cofield was not plain error under the facts of this case. As Williams recognized, the "overarching concern" of N.J.R.E. 404(b) is with predisposition evidence. Id. at 132, 919 A.2d 90. Unlike evidence of the commission of crimes similar to those with which defendant is charged, evidence of witness-tampering is unlikely to lead a jury to conclude that a defendant is predisposed to commit the type of crime with which he is accused. The jury was not likely to conclude that Burden was predisposed to commit home invasions because he tried to convince Clayton not to testify against him in this case. Moreover, the prosecutor did not suggest to the jury, in summation or otherwise, that they should use the evidence to draw such an improper conclusion. Finally, in the charge, the trial judge gave the jury a very strong general admonition against the misuse of other crimes evidence. All of this leads us to conclude that in this case, the absence of a more specific charge tailored to the witness-tampering evidence was harmless.
. . . .
In summary, we find no grounds upon which to reverse defendant's conviction. The case against defendant was reasonably strong based on the testimony of Clayton and Jefferson, and the discovery by the police of the assault handgun in circumstances supporting a strong inference that it was discarded by the men gathered in Clayton's yard. Defendant did not dispute that he and his co-defendants were present near Clayton's house. The principal issue in dispute was whether they were there to commit an armed home invasion or merely to relieve themselves in the yard. Defendant did incalculable damage to his own defense by attempting to bribe Clayton into silence and by offering trial testimony that was fraught with contradictions and which, even on a cold record, lacked the ring of truth.
[After affirming defendant's conviction the court remanded for reconsideration of the extended term sentence pursuant to State v. Pierce, 188 N.J. 155, 172-73, 902 A.2d 1195 (2006), and State v. Thomas, 188 N.J. 137, 152, 902 A.2d 1185 (2006).]
Affirmed in part, remanded in part.
NOTES
[1] [At the court's direction, portions of the factual discussion and the court's rulings have been omitted from the published opinion.]
[2] This street name is alternately recorded in court transcripts as G'Money.
[3] The four men were defendant Burden, Billy D. Jones, Clarence Cantie, and Wayne Jefferson, who identified himself as "Jermaine" Jefferson.
[4] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[5] The State claimed that shortly before the trial commenced, Burden made a statement to Jefferson aimed at intimidating him into refusing to testify. In his trial testimony, Jefferson denied that Burden had threatened him. Rather he testified in neutral fashion that the two of them were merely discussing the case.