713 A.2d 1 (1998)
313 N.J. Super. 129
STATE of New Jersey, Plaintiff-Respondent,
v.
Luis Angel TORRES, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted May 28, 1998.
Decided June 11, 1998.
*4 Ivelisse Torres, Public Defender, for defendant-appellant (Diane Toscano, Assistant Deputy Public Defender, of counsel, and on the brief).
Peter Verniero, Attorney General, for plaintiff-respondent (Paul H. Heinzel, Deputy Attorney General, of counsel, and on the brief).
Before Judges SHEBELL, D'ANNUNZIO and COBURN. *2
*3 The opinion of the court was delivered by SHEBELL, P.J.A.D.
Defendant, Luis Angel Torres, and a codefendant, Luis Gamboa, were charged as juvenile offenders arising out of an armed robbery and murder that took place on September 6, 1991, at the D'Oro Jewelry Store in Union City. Upon the State's motion for waiver of juvenile jurisdiction seeking to try them as adults, a hearing was conducted on January 22, 23, and 24, 1992. At the completion of the hearing, the judge ordered both juveniles waived to adult court.
Torres and Gamboa were indicted on March 4, 1992, as follows: count one, knowing or purposeful murder (N.J.S.A. 2C:11-3(a)(1) or (2)); count two, felony murder (N.J.S.A. 2C:11-3(a)(3)); count three, armed robbery (N.J.S.A. 2C:15-1); count four, possession of a handgun for an unlawful purpose (N.J.S.A. 2C:39-4(a)); and count five, possession of a handgun without a permit (N.J.S.A. 2C:39-5(b)).
The two were tried separately. Defendant was tried first. On June 10, 1993, the trial judge held a Rule 8 (now N.J.R.E. 104(c)) hearing to determine the admissibility of: (1) statements made by defendant to Joel Maestre, a correction's officer at the Hudson County Youth House; and (2) the statement defendant gave to police on the night of his arrest. At the conclusion of the hearing, the judge ruled that both statements were admissible. Defendant's jury trial lasted six days and concluded on June 22, 1993, when the jury returned a verdict convicting defendant on all counts.
On August 4, 1993, defendant was sentenced to a term of life imprisonment with a thirty-year parole ineligibility period on count one, a term of eighteen years with a six-year parole ineligibility period on count three,[1] and a term of five years on count five. The sentences were to run concurrently. For sentencing purposes, the judge *5 merged count two into count one and count four into count five.
Defendant appeals, raising the following legal arguments:
POINT I
THE FAILURE OF DEFENSE COUNSEL OR THE COURT BELOW TO ADVISE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO TESTIFY ON HIS OWN BEHALF AT THE WAIVER HEARING REQUIRES THAT THE WAIVER RULING BE VACATED AND A NEW HEARING HELD. U.S. CONST. AMEND. V, VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 10. (NOT RAISED BELOW).
POINT II
THE PROSECUTOR'S QUESTIONS DURING TRIAL AND COMMENTS DURING OPENING STATEMENTS AND SUMMATION ON DEFENDANT'S POST-ARREST SILENCE DENIED DEFENDANT HIS RIGHT TO REMAIN SILENT AND DEPRIVED HIM OF A FAIR TRIAL. U.S. CONST. AMEND. V, VI. XIV; N.J. CONST. ART. I, PARS. 1, 9, 10. (RAISED IN PART BELOW).
POINT III
THE PROSECUTOR'S IMPROPER QUESTIONS, AND IMPROPER REMARKS DURING SUMMATION, WERE SO EGREGIOUS THAT DEFENDANT WAS DEPRIVED OF A FAIR TRIAL. U.S. CONST. AMENDS. VI, XIV; N.J. CONST. ART. I, PAR. 9. (RAISED IN PART BELOW).
A. The Prosecutor Commented on Defendant's Post Arrest Silence.
B. The Prosecutor Misstated The Law, Appealed To Emotion and Denied Defendant The Presumption Of Innocence.
C. The Prosecutor's Argument That The Ballistics Testimony And Other Physical Evidence Proved That Gamboa Was Telling The Truth Amounted To Testifying By The Prosecutor As A Ballistics And Crime Reconstruction Expert, Was Based On Facts Not In Evidence, And Resulted In Elaborate And Improper Vouching For Gamboa's Credibility By The State. (Not Raised Below).
D. The Prosecutor's Argument That The State Had Made No Plea Agreements or Promises to Gamboa In Exchange for His Statement And Testimony, Inviting The Inference That Gamboa Therefore Had No Interest In The Outcome Of This Trial, Was Misleading. In Addition Such Statements Amounted To Elaborate Vouching For The Credibility Of Gamboa. (Not Raised Below).
E. The Prosecutor Suggested to the Jury That Their Duty Was To Convict The Defendant. (Not Raised Below).
F. The Prosecutor Misstated The Testimony.
G. The Prosecutor's Representation That The Autopsy Photographs Constituted Eyewitness Testimony Was Improper.
H. The State Elicited Testimony Concerning Defendant's Impecuniosity. (Not Raised Below).
I. The State Elicited Testimony From Defendant Characterizing A State's Witness As A Liar.
POINT IV
THE TRIAL COURT DENIED DEFENDANT'S RIGHTS TO DUE PROCESS OF LAW AND A FAIR TRIAL DUE TO ITS WOEFULLY INADEQUATE INSTRUCTION TO THE JURY ON THE LAW REGARDING HOW TO EVALUATE THE CREDIBILITY OF GAMBOA, AN ACCOMPLICE AND THE CHIEF PROSECUTION WITNESS AGAINST DEFENDANT. IN ADDITION BASED ON THE FACTS OF THIS CASE, THE COURT SHOULD HAVE SUA SPONTE INSTRUCTED THE JURY THAT THE STATE COULD OFFER GAMBOA A PLEA AGREEMENT OR SENTENCE REDUCTION AFTER TRIAL. (U.S. CONST. AMENDS. V, VI AND XIV; N.J. CONST. (1947), ART. I, PARS. 1, 9 AND 10). (NOT RAISED BELOW).
A. The Trial Court's Instruction To The Jury On "Expectation of Benefit" Was Totally Inadequate Since The Model Jury Charge On Accomplice Liability Was Required.
B. The Trial Court Should Have Sua Sponte Instructed The Jury That The *6 State Had The Authority To Offer Gamboa A Plea Agreement Or Sentence Reduction After Defendant's Trial.
POINT V
THE COURT'S INSTRUCTIONS TO THE JURY WHICH ERRONEOUSLY DEFINED THE AFFIRMATIVE DEFENSE OF DURESS AND INCORECTLY STATED THE STATE'S BURDEN OF PROOF AS TO DURESS; ERRONEOUSLY EXPLAINED THAT ACCOMPLICE LIABILITY COULD BE PROVED BY SHARED INTENT OR PARTICIPATION; AND ERRONEOUSLY INSTRUCTED THAT A KNOWING STATE OF MIND WAS SUFFICIENT TO PROVE ACCOMPLICE LIABILITY, DENIED DEFENDANT A FAIR TRIAL. U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. ART. 1, PAR, 1, 9, 10. (NOT RAISED BELOW).
A. The Instruction On Duress.
B. The Accomplice Liability Instruction Erroneously Allowed The Jury To Find Accomplice Liability Based On Either Shared Intent Or Actual Participation.
C. The Accomplice Liability Instruction Erroneously Allowed The Jury To Find Accomplice Liability Based On A Knowing Rather Than A Purposeful State Of Mind.
POINT VI
OTHER CRIMES EVIDENCE, CONSISTING OF TESTIMONY FROM A DETENTION OFFICER THAT DEFENDANT TRIED TO BRIBE HIM, AND TESTIMONY THAT DEFENDANT HAD DISTRIBUTED COCAINE TO THE CO-DEFENDANT, ADMITTED WITHOUT A HEARING AND WITHOUT LIMITING INSTRUCTIONS, DENIED DEFENDANT A FAIR TRIAL. (NOT RAISED BELOW).
POINT VII
DEFENDANT'S ALLEGED STATEMENTS TO A DETENTION OFFICER SHOULD HAVE BEEN EXCLUDED BECAUSE DEFENDANT WAS QUESTIONED BY THE OFFICER IN A CUSTODIAL SETTING WITHOUT THE BENEFIT OF MIRANDA WARNINGS AND IN THE ABSENCE OF COUNSEL. (RAISED IN PART BELOW).
POINT VIII
THE DOUBLE HEARSAY TESTIMONY OF DETECTIVE ANGERMAYER, RELATING WHAT HE WAS TOLD BY GARCIA TELLING WHAT HE WAS TOLD BY GAMBOA, WAS INADMISSIBLE HEARSAY AND DENIED DEFENDANT A FAIR TRIAL. (NOT RAISED BELOW).
POINT IX
THE JUDGE ABUSED HIS DISCRETION IN SENTENCING THE 16-YEAR OLD DEFENDANT TO THE MAXIMUM SENTENCE FOR MURDER BECAUSE THE JUDGE DID NOT CONSIDER DEFENDANT'S LACK OF A PRIOR CRIMINAL RECORD OR HIS YOUTH AS MITIGATING FACTORS.
The co-defendant, Gamboa, testified on behalf of the State that he and defendant had met in school and had known each for about five months when on September 6, 1991, they carried out the armed robbery of the jewelry store. They had planned the robbery the day before with Carlos Cruz who gave defendant the gun. The plan was to tie up the owner, Andy Shum. Defendant was supposed to point the gun at the victim, getting him away from the alarm, while Gamboa tied him up. They planned to take Shum into the bathroom and then rob the store. According to Gamboa, defendant told him that he knew the owner and had previously sold him stolen jewelry.
On the day of the robbery, Gamboa was on the corner by the high school drinking with friends, when at about noon, defendant came along. They hung around talking to girls until about 3:30 p.m. At about 4:00 p.m., they walked to the jewelry store. Defendant had a black bag with the gun in it. Gamboa carried a bag containing the rope. When they arrived, Shum buzzed them in and defendant asked if he wanted to buy some jewelry. Shum said that he did. Defendant said they had to go get the jewelry and that they would be back later. They went to the store that first time to check for alarms. When they returned fifteen minutes later, defendant told Shum he had jewelry in the *7 black bag. Defendant reached in the bag, took out the gun and shot Shum once in the neck from about three feet away, even though Shum had raised his hands. About three seconds later, defendant again shot Shum in the temple at an even closer range. Shum died as a result of a laceration and edema of the brain caused by that gunshot wound. Gamboa asked defendant why he had shot Shum, and defendant answered that he had to because he would recognize them.
Gamboa knew defendant had the gun and that there was going to be a robbery but maintained that shooting the man was not part of the plan. In his original statement to the Union City Police in September 1991, Gamboa had said that he did not know that defendant planned on bringing a gun to the robbery. However, in his subsequent statement on January 11, 1993, to the Hudson County Prosecutor's Office, Gamboa said that he knew about the gun and was there the night before the robbery when Cruz gave defendant the gun. A latent print lifted from the counter was identified as defendant's right palm print.
At trial, a detective testified that Javier Garcia had gone to another detective, who lived across the street from Garcia, and told him that he knew who was responsible for the shooting and robbery at the jewelry store. Garcia was brought to headquarters where he told police that both individuals were named Luis, but he did not know their last names. However, he gave full descriptions of both. He gave police the address and pointed out where "the first Luis" (Gamboa) lived on Eighth Street. "The second Luis" (defendant) had a girlfriend named Lucy, who was pregnant and lived on Ninth Street and New York Avenue in Union City. Garcia told police that on the night of the incident, Gamboa had told him that defendant was the shooter. The officers drove around with Garcia who was able to point out Gamboa as the one who had told him the story of what had happened.
On September 8, 1991, two days after the crime, Gamboa was arrested for aggravated assault with a handgun. After Gamboa was arrested, he accompanied the police to a bush where a .25 caliber automatic pistol was recovered. He said defendant had put it there after the shooting. In his formal statement to the police, Gamboa identified defendant as having been with him in the store that night and as having been the shooter. Gamboa said that he was aware that he was going to a store to rob it as he and defendant had discussed it the night before. Based upon that conversation, the detectives went to search for defendant. Two officers waited outside of defendant's house and arrested him when he came outside. Defendant was with his girlfriend. He was read his rights and transported to headquarters.
The police called defendant's mother who responded to the police station. She did not speak English, so a detective acted as interpreter. She was allowed to speak to her son who was in the interrogation room. Defendant was calm as to his arrest but was upset with Detective Caputo because he had transported defendant's girlfriend to headquarters. Defendant was again read his rights, and at 9:45 p.m., defendant and his mother initialed the Miranda waiver card. However, defendant then told Caputo that he did not like his attitude and would not speak to him.
That same evening, Detective Brian Barrett was off-duty, but had stopped at headquarters on his way home from the shore. He offered to sit with defendant who was waiting to be transported. Defendant asked Barrett his name, and Barrett told him. According to Barrett, defendant said to him: "I want to tell you my story, I want to tell you what happened." Barrett told defendant that he did not want to hear his story; Barrett wanted to go home. Barrett asked defendant why he had not given his story earlier, and defendant responded that he did not like Caputo's attitude. Barrett notified the supervisor that defendant was now ready to give a statement. They sent back another detective to take the statement, but defendant would not give him a statement, as he would speak only to Barrett.
At that point, Barrett prepared to take defendant's statement. Defendant's mother was summoned back to the police station. Through the interpreter, defendant's mother was advised of the charges against her son and told that he wished to speak to Barrett.
*8 She agreed to allow her son to give a statement, and defendant signed a waiver and gave his statement to Barrett at 11:58 p.m. According to defendant, he did not know that Gamboa had a gun. Gamboa took the gun from a black bag, and when Shum turned to put the cup on top of the safe, Gamboa shot him. The man was trying to say something, but Gamboa shot him again. Gamboa took the jewelry, and defendant did not know where it was. According to Shum's wife, $120,000 worth of jewelry was taken. Defendant explained in his statement that he did not give his statement to Caputo because he did not like his attitude.
Maestre, a correction's officer at the Hudson County Youth House testified that he oversaw a dormitory in which defendant and Gamboa were housed. In October 1991, he saw defendant when he returned from court. Defendant looked distraught, so he asked him if everything was all right. Defendant said he got remanded back to the youth house until his next court date. Defendant said that he could not "do the time," and offered to give the officer $2500 up front if he would tell the prosecutor's office that he had overheard Gamboa tell another inmate at the youth house that Gamboa had done the shooting. Defendant would give the officer an additional $2500 and some jewelry when he was released. Defendant explained that he had the $5000 because he and Gamboa sold some of the jewelry. The next day, defendant said that the offer still stood. At trial, defendant claimed that he had never spoken to the officer at the youth house and had never offered him money and jewelry.
Defendant testified that he was sixteen years old on September 6, 1991. It was by accident that he ran into Gamboa on that day, a block away from the high school. Defendant told Gamboa that he was on his way to the jewelry store to get a ring for his girlfriend for their second anniversary of dating. Gamboa asked if he could go with defendant. The two walked to the jewelry store and there was no previous discussion about robbing this store. Defendant claimed that he had never been to that store before and did not know the owner.
Defendant claimed that he was not carrying anything, but that Gamboa was carrying a black bag. Defendant asked Shum if he could see some rings, and the owner showed him a panel of rings. The owner moved toward the safe to get more samples, when defendant saw Gamboa remove a gun from the bag and fire two shots at the owner. Gamboa put the gold in his bag, although they left some jewelry behind. Defendant pushed the button on Shum's waist, which caused the door to click, at which time Gamboa opened the door, walked out, and held the door open for defendant. They then ran out of the store. Two blocks from the store, Gamboa "passed" the gun to defendant, and defendant threw the gun into the bushes. Defendant maintained that he did not sell the jewelry or receive anything as a result of the robbery. Gamboa left with the jewelry, and defendant did not see him again until they were at the youth house.

I
Defendant contends that the failure of defense counsel or the court below to advise him of his constitutional right to testify on his own behalf at the juvenile waiver hearing requires that the waiver ruling be vacated and a new hearing held. He asserts that he was deprived of the chance to address the juvenile court as to why he should not be tried as an adult. He complains that defense counsel called only one witness at the waiver hearing, a regional coordinator employed by the Department of Corrections. He argues that because the record is silent on the issue, at the very least, the matter should be remanded for a hearing to establish whether he was ever advised of his right to testify at the waiver hearing.
In a homicide proceeding against a juvenile, the waiver hearing is a critical stage. State v. Ferguson, 255 N.J.Super. 530, 535, 605 A.2d 765 (App.Div.1992), certif. denied, 138 N.J. 265, 649 A.2d 1285 (1994); State v. R.G.D., 108 N.J. 1, 4, 527 A.2d 834 (1987). This is so because once waiver occurs, the juvenile "loses all the protective and rehabilitative possibilities available to the Family Part." Id. at 5, 527 A.2d 834.
*9 N.J.S.A. 2A:4A-26 creates a strong presumption that the Family Part shall transfer jurisdiction of a juvenile aged fourteen or over to an adult court if it finds probable cause to believe that the juvenile has committed a serious offense enumerated in the statute. State v. Jack, 144 N.J. 240, 246, 676 A.2d 545 (1996); Ferguson, supra, 255 N.J.Super. at 535-36, 605 A.2d 765. The accused has the burden of showing that the probability of rehabilitation substantially outweighs the reasons for waiver. N.J.S.A. 2A:4A-26. The decision to waive jurisdiction and refer a juvenile complaint to the Law Division is discretionary and will not be disturbed unless it is shown that the exercise of discretion was abused. State v. Matarama, 306 N.J.Super. 6, 16, 703 A.2d 278 (App.Div. 1997), certif. denied, 153 N.J. 50, 707 A.2d 154 (1998).
Our Legislature has accorded juveniles all rights given to adults charged with a crime. Ferguson, supra, 255 N.J.Super. at 537, 605 A.2d 765. N.J.S.A. 2A:4A-40 provides:
All defenses available to an adult charged with a crime, offense or violation shall be available to a juvenile charged with committing an act of delinquency.
All rights guaranteed to criminal defendants by the Constitution of the United States and the Constitution of this State, except the right to indictment, the right to trial by jury and the right to bail, shall be applicable to cases arising under this act.
Both federal and New Jersey law recognize that the accused in a criminal trial has the constitutional right to testify on his or her own behalf. The United States Supreme Court found that this right is guaranteed by the Fifth Amendment privilege against selfincrimination, the Sixth Amendment rights to compulsory process and to conduct one's own defense, and the Fourteenth Amendment right to due process. Rock v. Arkansas, 483 U.S. 44, 51-53, 107 S.Ct. 2704, 2709-10, 97 L.Ed.2d 37, 46-47 (1987). The New Jersey Supreme Court has stated that a defendant's right to testify on his or her own behalf in a criminal trial is guaranteed by our State Constitution, N.J. Const. art. I, ¶¶ 1 and 10, and by statute, N.J.S.A. 2A:81-8. State v. Savage, 120 N.J. 594, 627-28, 577 A.2d 455 (1990).
The right to testify at one's trial is a fundamental right which can be waived "only by an `intentional relinquishment or abandonment.'" Savage, supra, 120 N.J. at 628, 577 A.2d 455 (quoting Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938)). However, the "waiver need not be on the record to withstand appellate scrutiny." State v. Buonadonna, 122 N.J. 22, 36, 583 A.2d 747 (1991).
There is a constitutional tension inherent in requiring a trial court to advise a defendant of the right to testify or to inquire whether the defendant has waived that right. Savage, supra, 120 N.J. at 629-30, 577 A.2d 455. Discussion of the issue with the accused "might `inappropriately involve the trial court in the unique attorney-client relationship, raising Sixth Amendment as well as Fifth Amendment concerns.'" Id. at 629, 577 A.2d 455 (quoting State v. Bogus, 223 N.J.Super. 409, 424, 538 A.2d 1278 (App. Div.), certif. denied, 111 N.J. 567, 546 A.2d 497 (1988)). The decision of whether to testify belongs ultimately to the defendant, and it "is an important strategical choice, made by defendant in consultation with counsel." Id. at 631, 577 A.2d 455. Therefore, "when a defendant is represented by counsel, the trial court is not required to inform defendant of his right to testify or explain the consequences of that choice." Id. at 630. The Savage Court did, however, add:
Counsel's responsibility includes advising a defendant of the benefits inherent in exercising that right and the consequences inherent in waiving it. To ensure that counsel meets that obligation, it may be the better practice for a trial court to inquire of counsel whether he or she had advised a defendant, particularly a capital defendant, of his or her right to testify. This will best ensure that defendant's constitutional rights are fully protected. Indeed, counsel's failure to do so will give rise to a claim of ineffectiveness of counsel.

[Id. at 631, 577 A.2d 455.]
In Ferguson, supra, the fourteen-year-old defendant was convicted of murder at a trial *10 held after a transfer hearing where the Family Court judge waived jurisdiction and transferred the case to the Law Division for prosecution as an adult. 255 N.J.Super. at 531, 605 A.2d 765. We concluded there were two deficiencies in the waiver hearing: (1) defense counsel did not tell the defendant or his mother that he had a right to testify at the hearing; and (2) defense counsel seemed to put the case in the lap of a retained psychiatrist and stood aside. Id. at 536, 605 A.2d 765. We noted that the Savage Court had held that defense counsel, not the judge, has the responsibility to advise the juvenile of his right to testify, and that the best practice is for the judge to inquire of counsel on the issue. Id. at 539, 605 A.2d 765. Applying those principles in Ferguson, we rejected the State's claim of harmless error and reversed. Ibid.
We find Ferguson distinguishable because there the defendant had sought reconsideration of the decision to transfer and at a hearing on that request, defense counsel testified and admitted that he did not inform the defendant or his mother of the defendant's right to testify at the transfer hearing. Id. at 538, 605 A.2d 765. Here, the record does not demonstrate that defense counsel admitted that he failed to inform defendant of his right to testify. We reject defendant's assertion that it must be presumed that counsel failed to inform him of this right because the waiver of such a paramount constitutional right is routinely placed on the record. If defendant had filed a motion for reconsideration of the waiver of jurisdiction, there would have been a hearing as to whether defense counsel informed defendant of his right to testify. We cannot determine from the present record whether defendant was so advised and whether the waiver hearing was flawed.
Under Savage, it is the responsibility of defense counsel, not the trial court, to advise a defendant on whether or not to testify and to explain the consequences of waiving that right. Although the Court suggested that it may be the better practice for the court to inquire of defense counsel whether the defendant was advised of that right, it is not mandatory. Thus, the fact that the judge did not make such an inquiry of defense counsel on the record is not grounds for reversal.
Moreover, our Supreme Court in State v. Jack, 144 N.J. 240, 676 A.2d 545 (1996), recognized that not every claim of ineffective assistance of counsel at a juvenile waiver hearing requires a new hearing. Id. at 254, 676 A.2d 545. To secure a new hearing, a juvenile must make a prima facie showing that "there was evidence of a genuine potential for rehabilitation that counsel did not present to the juvenile court." Id. at 255, 676 A.2d 545. If such a showing is made, the appellate court may order a remand to the juvenile court for a hearing: (1) to assess the attorney's reasons for not presenting to the waiver court the evidence of the potential for rehabilitation and to determine whether that failure was due to the ineffectiveness of counsel; and (2) to determine whether the result of the waiver proceeding would have been different if there had been a showing of that potential by effective counsel. Id. at 245, 255, 676 A.2d 545. If both tests are met, there should be a new waiver proceeding. Ibid. However, if the remand court determines that the best efforts of competent counsel would not have prevented waiver because the prospects for rehabilitation did not substantially outweigh the reasons for waiver, then the defendant's conviction in adult court stands. Id. at 254, 676 A.2d 545.
In the present case, defendant has not asserted ineffective assistance of counsel and does not claim that his attorney failed to inform him of his right to testify. Rather, he argues that the record does not indicate that he was so advised by his attorney. That contention does not rise to the level of a prima facie showing that there was evidence of a potential for rehabilitation that counsel did not present to the juvenile court, requiring a remand hearing. Further, given the crime itself, it is unlikely that the result of the waiver hearing would have been different had defendant testified. The sentencing court found in refusing to consider defendant's youth as a mitigating factor, that this was a cold-blooded and premeditated, execution-style murder, and no mitigating factors were found. In light of the finding of the *11 aggravating factor of the need to deter, we fail to see how the result would have been a denial of waiver.

II
Defendant contends that the prosecutor's questions during trial and comments during his opening statement and summation regarding defendant's post-arrest silence deprived defendant of his right to remain silent and a fair trial.
During his opening statement, the assistant prosecutor stated:
Now, the police officers go to Gamboa's address, and there's a stakeout, and Caputo will tell you that Gamboa is stoppedbefore they even tell him what's going onGamboa is like, look, I had nothing to do with the shooting. I was down for the robbery. I'll even show you where the gun is, and takes him to a location. And from underinside of a tree, a bush, they find a .25 caliber automatic weapon.
....
So they, then, take Gamboa to police headquarters, and they contact his mother.... She agrees, he agrees, and he gives a statement.
Now, while this is happening, the police officers pick up Luis Torres, who was in the company of his girlfriend, Lucinda Cuba, when he's arrested. In fact, she even accompanies him, or is brought with him to police headquarters.
Torres is read his rights at the scene, doesn'tisn't asked any questions, gets down to police headquarters, and because, apparently, he didn't like Detective Caputo's attitudewhich you'll hear testimony about"attitude," he doesn't give a statement; but, later, during the course of the evening, in the presence of his mother, after the same forms are read, he gives Detective Barrett, Brian Barrett, a statement.
Defendant also complains about the following testimony pertaining to defendant's arrest that the prosecutor elicited from Caputo during direct examination:
Q. And at a certain point in time, did you read Mr. Torres his [Miranda ] rights, again, at police headquarters?
A. Yes.
Q. Now, you were saying this in English; Detective Ortega is interpreting, correct?
A. That's correct.
Q. Now, did Mr. Torres speak English?
A. Yes, he did.
Q. Did he have any difficulty understanding anything?
A. None whatsoever.
Q. Did he give you a statement at that time?
A. No, he didn't.
Q. After he told you he didn't want to give you a statement
MR. SERTERIDES: Objection, Judge.
THE COURT: Sustained.
Q. The statement was after that aspectdid you initiate any more questions with respect to Mr. Torres?
A. No, I didn't.
Defendant points to the following testimony from the prosecutor's direct examination of Barrett, the officer who was off-duty but sat with defendant while he waited to be transported:
Q. What happened next?
A. He stated to me, I want to tell you my story, I want to tell you what happened.
Q. What did you tell him?
A. I said, I didn't want to hear your story. I wanted to go home, actually.
Q. And did you tell him anything with respect to any other detective?
A. I asked if he was given the opportunity, prior to this, to give a statement, or tell his story. He said, yes, he did. But, LieutenantDetective Caputo, I asked him why he didn't give his story, or his statement to Detective Caputo, and he told me he didn't like his attitude.
Barrett continued that defendant said that he would give his statement only to Barrett, so Barrett took his statement.
*12 Finally, pointing to the following portions of the prosecutor's summation, defendant argues that the prosecutor urged the jury to disbelieve defendant's testimony because he, unlike Gamboa, did not immediately give a statement at the time of his arrest:
Now, Gamboa gives you his statement on September 8th, 1991. Isn't that statement somebody coming clean, isn't that statement dealinghe doesn't come out say I was going to do something, you know this horrible thing happened, does that make sense to you that Mr. Torres finds himself in this horrible situation and he responds the way that he does, does that make sense to you?
Javier Garcia then tells the police, the police go out looking for two individuals, Gamboa and Torres, as a result of that. They bring Gamboa into headquarters around 7:30 p.m., Gamboa immediately decides to give the police a statement, no hesitation, no problems, what does he say?
Now, think about this, because when we're dealing with credibility of witnesses that's what this trial is all about, no one is saying that either one of these individuals is the salt of the earth, because they're not. We're trying to figure out who's telling the truth and who isn't.
Defendant maintains that although there was an objection only to Caputo's testimony, which the trial judge sustained, all of the above-quoted testimony and statements at trial violated defendant's right to remain silent. He points out that the credibility of defendant and Gamboa was squarely at issue, and the prosecutor urged the jury to infer from defendant's silence at the time of his arrest that he was fabricating his later statement and testimony at trial, and that Gamboa, who gave a statement immediately, was more credible.
It is well-established that because of a defendant's right to remain silent the prosecution may not comment upon or pose questions regarding a defendant's silence or his failure to disclose exculpatory information to the police at or after the time of his arrest, nor may the prosecutor use defendant's silence for impeachment purposes during cross-examination. State v. Deatore, 70 N.J. 100, 112-15, 358 A.2d 163 (1976). The right to remain silent in the face of police interrogation is a fundamental aspect of the privilege against self-incrimination. Id. at 114, 358 A.2d 163. The use of a defendant's silence is improper whether or not the defendant has received Miranda warnings. Id. at 117 n. 10, 358 A.2d 163. The Deatore Court reached its conclusion "as a matter of state law and policy," based upon the "privilege against self-incrimination which is enshrined in the common law." Id. at 112, 113, 358 A.2d 163. In Deatore, supra, the Court stated: "defendant is under no obligation to volunteer to the authorities at the first opportunity the exculpatory story he later tells at his trial and cannot be penalized directly or indirectly if he does not." 70 N.J. at 115, 358 A.2d 163.
In the instances quoted above, the prosecutor's comments related to defendant's delay before eventually deciding to give a statement to Barrett. If defendant's delay or refusal to give a statement to Caputo was related to his right to remain silent, it would constitute an improper reference to defendant's exercise of his Federal and State rights. The State's case demonstrated that defendant was reluctant to give a statement, whereas Gamboa spoke up, and therefore, the prosecutor argued that Gamboa was to be believed. However, there was never any suggestion that the defendant was standing on his right not to speak.
The fact that defendant's attorney objected only during the direct examination of Caputo is significant on this point. While the prosecutor used defendant's delay in giving a statement to attack his credibility and bolster Gamboa's, we find that it was obvious at trial that the delay was not based on defendant's invoking of his constitutional right to remain silent. Rather, as seen in defense counsel's cross-examination of Caputo, defendant's refusal to speak to him was explained throughout as related to his dislike of Caputo's attitude and his treatment of Lucy.
Defense counsel on cross-examination of Caputo brought out:
Q. You participated in the arrest of Luis Gamboa?
*13 A. Yes, I did.
Q. And Mr. Torres?
A. Yes, I did, sir.
Q. And both gave statements, correct?
A. Yes.
....
Q. At one point, on the evening of the arrest of Mr. Torres, while he was in the station house, he indicated he did not want to speak to you. Is that correct?
A. That is correct.
Q. He had indicated that there was something about your attitude that he didn't want to speak with, correct?
A. Correct, sir.
Q. Did anything happen between the two of you?
A. Mr. Torres was upset, because I had transported his girlfriend up to headquarters with the other two individuals at the time.
The explanation of defendant's reluctance to speak to Caputo firmly was established by Caputo's testimony about defendant's being upset with him because he had transported his girlfriend to headquarters. Moreover, defendant's refusal to give his version was rather isolated and brief. We fail to perceive in these circumstances that the State's comments and arguments compromised defendant's right to remain silent. It was clear that defendant was willing to give his version but only to Barrett.

III
Defendant contends that the prosecutor's argument that the State had made no plea agreements with or promises to Gamboa in exchange for his statement and testimony invited the improper inference that Gamboa consequently had no interest in the outcome of defendant's trial. In fact, after the trial, on December 20, 1993, Gamboa pled guilty to first degree armed robbery, the third count of the indictment against him, pursuant to a plea bargain in which the State agreed to dismiss the remaining counts of the murder indictment, and to recommend that the court sentence Gamboa to a custodial term of up to twenty years with a ten-year parole ineligibility period. On January 28, 1994, the judge approved the plea agreement between Gamboa and the State, sentenced Gamboa for first degree armed robbery to a custodial term of twenty years with a ten-year parole ineligibility period, and dismissed the remaining counts of the indictment.
Defendant complains about the following questions that the prosecutor asked Gamboa on direct examination:
Q. Mr. [Gamboa], are you aware of the fact that if you tell us that you knew there was a gun when the robbery was being committed and that someone died, that you're basically admitting to felony murder?
A. Yes.
Q. You realize that, do you not?
A. I realize it.

* * *
Q. Was it explained to you prior to giving the statement by your attorney and by me
A. Yes.
Q. That if you swore an [sic] oath, gave this statement, told us that you knew there was a gun, that you were facing the most serious charge?
A. For murder.
Q. Felony murder with as much time, correct?
A. Yes.
Q. Even though you never touched the gun, you knew that, did you not?
A. Yes, I did.
Q. I asked you well why do you want to give us a statement, why do you want to give us a statement?
A. Because it was wrong, what happened, somebody die [sic] and I think it's wrong.
Q. Were you offered any type of reduced jail sentence for giving the statement and testifing [sic]?
A. No.
Q. Are you expecting to receive any benefit as a result of this testimony you're giving today?
A. No.
*14 Q. Mr. Gamboa, you're scheduled for trial next, are you not?
A. Yes.
Q. You realize that this seals your fate on a felony murder conviction?
A. Yes, I realize.
Q. Has anybody in any way offered you anything for coming
A. No.

* * *
Q. Mr. Gamboa, do you expect to receive any type of benefit for your testimony here today?
A. No.
In questioning Gamboa about the taking of his second statement, the prosecutor asked:
Q. I talk about when we were in the jury room that time I told you no promises or no jail sentence reductions are in line for you, isn't that true?
A. That's true.

* * *
Q. In fact you contacted Mr. Desmond, you were brought into our office where we are right now, isn't it true that I also told you that no way whatsoever was I offering you any promises by way of a reduced jail sentence or any benefit by giving me the statement, isn't that true?
What's your answer, sir?
A. Yes.

* * *
Q. Did I explain to you that once you gave this statement, you would be opening yourself up to felony murder?
A. That's correct.
We find no reversible error considering the record as a whole. During summation, defense counsel told the jury that if they believed that Gamboa had testified with no thought of advantage, then they were "born last night." Defense counsel added that whether he expressed it or not, Gamboa had a hope that he would receive better treatment because of his testimony. Thereafter, the prosecutor in summation said that defense counsel had brought out a good point, and that there may have been an expected benefit in the mind of Gamboa. Finally, the trial judge instructed the jury that it could consider whether Gamboa had any hope of receiving a benefit and whether that affected his truthfulness.
Defendant's contention that the prosecutor's examination of Gamboa was misleading because the jury was not told that the prosecutor had the power to offer Gamboa a plea agreement or sentence reduction after the trial was over is not persuasive. The jury heard the relevant testimony that no promises had been made and that Gamboa had no expectation that he would be rewarded for his testimony.
Defendant relies on State v. Wilson, 128 N.J. 233, 607 A.2d 1289 (1992), wherein the Court had found improper the prosecutor's remark "that he would never make a deal with Dyson" because he was part of the murder. Id. at 242, 607 A.2d 1289. Wilson is distinguishable since in that case no one had testified in support of that assertion. Ibid. It is true that in Wilson, as here, the prosecutor's comment proved untrue because after the trial, the State's witness pled guilty to a lesser charge in exchange for the State's recommendation to dismiss the murder charge against him. In any event, the Wilson Court found that in view of the defendant's failure to object and the witness' testimony that he hoped the State would "look favorably" on the charges against him, the impropriety was not reversible error. Ibid.
Here, defense counsel in summation similarly pointed out to the jury that Gamboa hoped he would receive better treatment and the prosecutor candidly observed in summation that the point might have merit. The jury was free under the judge's charge to consider whether there was an expected benefit in Gamboa's mind, i.e., did he think that the court or prosecutor would treat him more favorably after trial because of his testimony. We find no unfair prejudice to defendant.

IV
Defendant contends that the "double hearsay testimony" of a detective, relating what Garcia told him and another detective about Garcia's conversation with Gamboa, was inadmissible hearsay and denied defendant a *15 fair trial. Defendant first points to the following portion of the prosecutor's opening statement:
fortunately, on September 8th, 1991, Captain Spincola of the Union City Police Department, was outside of his house; there was an individual that lived in the neighborhood by the name of Javier Garcia. It's a 15 or 16-year-old boy at the time. Javier Garcia goes up to Captain Spincola and says to him: Did you hear about the robbery at Doro Jewelers? Then he says, well, you know, tell me about it. And the kid starts to tell him specific things about the robbery, that only a person that was actually there had knowledge of it would know. Javier Garcia tells him, "I know the two people that did it." Of course, Captain Spincola asks him how, and he tells him, an individual by the name of Luis, the last name begins with either a C or a Gthis will turn out to be Gamboanot Torres, Gamboa, came to me after the robbery, and told me that him and Luis robbed the store; meaning Luis Torres eventuallyand Luis Torres shot the owner of the store.
Defendant also points to the following testimony from Detective Angermeyer's direct examination by the prosecutor:
Q. Okay, and at a particular point in time, were you ever contacted specifically on September 8th, 1991, by Captain Spincola, and asked to respond to interview a person by the name of Javier Garcia?
A. That's correct.
Q. Tell the ladies and gentlemen of the jury how that came about?
A. Javier Garcia had gone to Captain Spincola, who lives across the street from his house, and advised Captain Spincola that he knew who was responsible for the shooting and robbery at the jewelry store.
We went down and interviewed Mr. Garcia. From the information that he had given us, he had information that only a person who was in the store, or had been told by somebody who was in the store, which verified what he was telling us.
We then brought Mr. Garcia into headquarters for a formal statement.

* * *
Q. Now, you had referred to Mr. Garcia telling you who the alleged shooter was?
A. Mr. Garcia told us thatwell, he said, according to Mr. Gamboa, Luis Gamboa told him that Luis Torres was the shooter.
Q. And did he explain to you when he obtained that information from Mr. Gamboa?
A. The night of the actual incident.
"`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). It is not admissible except as provided by the evidence rules or other law. N.J.R.E. 802. The rules contain certain recognized exceptions to the hearsay rule. N.J.R.E. 803.
In State v. Bankston, 63 N.J. 263, 307 A.2d 65 (1973), a detective testified that after receiving information from an informant that an individual had narcotics in his possession, the police went to a bar where they saw and then apprehended the person fitting the description that they had obtained. Id. at 266-67, 307 A.2d 65. The Court held that the detective's testimony was inadmissible hearsay. Id. at 271, 307 A.2d 65. The Court acknowledged the well-established principle that the rule against hearsay is not violated when police officers explain the reasons that they approached a suspect or went to the scene of a crime by stating that they did so "upon information received." Id. at 268, 307 A.2d 65. This type of general testimony is admissible to show that the officer was not acting arbitrarily or to explain the officer's subsequent conduct. Ibid. However, when an officer becomes more specific by repeating what some other person told him or her concerning a crime by the defendant, the hearsay rule is violated. Ibid. Additionally, a specific hearsay statement is not always required in order to create an impermissible inference of guilt. Id. at 271, 307 A.2d 65. "When the logical implication to be drawn from the testimony leads the jury to *16 believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Ibid.
Defendant did not object to the introduction of any of Angermeyer's testimony or the prosecutor's comments during his opening statement. Thus, on appeal defendant must demonstrate plain error, "clearly capable of producing an unjust result." R. 2:10-2. Under Bankston, supra, for hearsay evidence to require reversal, the possibility of an unjust verdict "must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." 63 N.J. at 273, 307 A.2d 65.
The State argues that no possible prejudice could have resulted from the brief reference to the content of the information received from Garcia. The State asserts that "[o]ther, non-objectionable non-hearsay testimony indisputably established that Gamboa did indeed tell Garcia what had happened."
It appears that the double hearsay impact of the police testimony is at least partially vitiated because Gamboa himself testified that he told Garcia what had happened, including that defendant was the shooter. We are left then with the hearsay nature of Angermeyer's testimony relating to Garcia's verification that Gamboa told him on the night of the incident that defendant shot the victim. This corroborates Gamboa's testimony that he told Garcia on the same night as the shooting that defendant, not he, was the shooter. Gamboa's direct testimony on this matter was not objected to at trial or on appeal. Thus, if it was not plain error to admit Gamboa's testimony that he told Garcia, then the officer's testimony as to Garcia's report of what Gamboa said would appear to be harmless error. R. 2:10-2.
That testimony, as well as Gamboa's relating his connection with Garcia, had the effect of bolstering Gamboa's credibility by demonstrating that he had from the beginning consistently asserted that defendant did the shooting. We also note that without objection, Gamboa was permitted totestify that he told the "cops" when arrested, that he was not the one who did the shooting and that Luis Torres had the gun. He further testified that his prior statements were the truth. Thus, the real question is whether such bolstering of Gamboa's credibility by prior consistent statements was proper.
Somewhat akin to "fresh complaint" under N.J.R.E. 803(a)(2), a prior statement of a testifying witness, such as Gamboa, is admissible if it is "consistent with the witness' testimony and is offered to rebut an express or implied charge of recent fabrication or improper influence or motive." Such statements were excluded from the hearsay rule and made admissible as substantive evidence under the Evidence Rules adopted by Order of the Supreme Court of New Jersey on September 15, 1992. These rules became effective July 1, 1993, just nine days after the conclusion of defendant's trial.
In the event of a retrial, N.J.R.E. 803(a)(2) would permit proof of Gamboa's prior consistent statements to rebut the assertion that he was fabricating his trial testimony because of a motive to shift the blame to the defendant. In these circumstances, we cannot say that it was plain error to allow Gamboa's testimony as to his earlier statements that defendant, not he, shot Shum. R. 2:10-2. Further, as N.J.R.E. 803(a)(2) allows the use of such testimony as substantive evidence, it was also not plain error to omit a cautionary charge.

V
Defendant contends that "other crimes" evidence was improperly admitted at trial without a hearing and limiting instruction. He refers to the testimony of corrections officer Maestre that defendant tried to bribe him, and Gamboa's testimony that defendant sold the stolen jewelry and bought cocaine for Gamboa with the proceeds.
The admission of prior bad acts evidence is controlled by N.J.R.E. 404(b) which provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may *17 be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
That rule does not exclude evidence of other crimes, wrongs, or acts under all circumstances. State v. Nance, 148 N.J. 376, 386, 689 A.2d 1351 (1997). There are situations where the evidence is probative of some other fact in issue, such as motive. Ibid.
Once it is determined that the "other crimes, wrongs, or acts" evidence is material to a genuine disputed fact in the case and that such evidence is necessary, the probative value of the evidence must be balanced against the risk of undue prejudice against the defendant. Ibid.; State v. Marrero, 148 N.J. 469, 482, 691 A.2d 293 (1997). The trial court must conduct a balancing test pursuant to N.J.R.E. 403. Nance, supra, 148 N.J. at 387, 689 A.2d 1351. N.J.R.E. 403 provides that relevant evidence, otherwise admissible, may nevertheless be excluded if the court, in its discretion, finds that the evidence's probative value is substantially outweighed by, among other things, the risk of undue prejudice.
State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992), provides a four-part test which is to be used in determining when extrinsic evidence of other crimes or wrongs is admissible:
1. The evidence of the other crime must be admissible as relevant to a material issue;
2. It must be similar in kind and reasonably close in time to the offense charged;
3. The evidence of the other crime must be clear and convincing; and
4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[Cofield, supra, 127 N.J. at 338, 605 A.2d 230.]
Determinations on the admissibility of "other crimes, wrongs, or acts" evidence are left to the discretion of the trial court. State v. Marrero, supra, 148 N.J. at 483, 691 A.2d 293; State v. Nance, supra, 148 N.J. at 387, 689 A.2d 1351. The trial court's decision in this regard is entitled to deference and is to be reviewed under "an abuse of discretion standard." Ibid.
Here, a pre-trial hearing was held to determine the admissibility of Maestre's testimony, and the sole issue presented was whether admission of the statement violated defendant's Fifth Amendment rights. For the first time on appeal defendant argues that Maestre's testimony amounted to "other crimes" evidence because it consisted of an attempted bribe. Defendant did not ask for an "other crimes" hearing on the admissibility of Maestre's testimony or Gamboa's testimony that defendant purchased and distributed cocaine. He now argues that the admission of this evidence with no limiting instruction left the jury free to speculate that the testimony of the attempted bribery and distribution of cocaine was evidence that defendant was disposed toward crime.
"Other crimes" evidence which relates directly to the crimes for which the defendant is on trial is admissible if it "serves to paint a complete picture of the relevant criminal transaction," "`furnishes part of the context of the crime,'" or "`is necessary to a full presentation of the case.'" State v. Martini, 131 N.J. 176, 242, 619 A.2d 1208 (1993) (quoting United States v. Masters, 622 F.2d 83, 86 (4th Cir.1980)). In Martini, the Court found it "ridiculous" to conclude that the State should be prevented from showing that the defendant had driven the victim's stolen car to the diner to pick up his ransom and had threatened her simply because he was not charged with those crimes. Ibid. This type of evidence may be considered within the res gestae of the charged crimes. State v. Cherry, 289 N.J.Super. 503, 522, 674 A.2d 589 (App.Div. 1995). No limiting instruction is necessary when the "other crimes" evidence was related to the res gestae. Martini, supra, 131 N.J. at 242, 619 A.2d 1208.
The evidence here was not "other crimes" evidence as contemplated by Rule 404 and Cofield, Nance, and Marrero. Rather, these other acts were necessary to establish the nature and context of the full criminal *18 event. Gamboa testified that after the robbery and shooting, they took the bus to Hoboken where defendant sold a ring for $700 so that they could get money to take the train to New York. They then went to New York City, where defendant sold the jewelry for what Gamboa believed was $5000 and some cocaine. Defendant gave Gamboa $50 and one-and-a-half ounces of cocaine. The purchase and distribution of the cocaine was part of the entire context of the crime and flight. Maestre's testimony corroborated Gamboa's account of what happened. According to Maestre, defendant told him that he had the $5000 bribe money because he and Gamboa had gone to New York City and sold some of the jewelry. We find no reversible error in these circumstances.

VI
Defendant contends that the trial court abused its discretion in sentencing him to the maximum sentence for murder because the court did not consider defendant's lack of a prior criminal record or his youth as mitigating factors.
N.J.S.A. 2C:44-1(b)(7) provides that a sentencing court may consider as a mitigating factor that the defendant had "no history of prior delinquency." The judge, however, found that although neither resulted in final disposition, defendant had been arrested for two prior juvenile offenses: (1) possession of burglary tools; and (2) improper behavior. A sentencing court may consider a juvenile record even if the charges did not result in convictions. State v. Tanksley, 245 N.J.Super. 390, 396, 585 A.2d 973 (App.Div.1991). Thus, the trial court did not err in failing to consider that mitigating factor.
Youth may be considered as a mitigating factor if the defendant was "substantially influenced by another person more mature than the defendant." N.J.S.A. 2C:44-1(b)(13). That does not apply here and thus it was not error to omit that factor. The judge explained in great detail why he would not consider defendant's youth as a mitigating factor:
I had considered the probability of the mitigating factor of age because obviously that would be one that would jump out at you considering that Mr. Torres was 16 at the time of the incident. But I am not finding that as a mitigating factor for the following reasons:
Ordinarily when we look at someone's age to try to consider if there is mitigation, we ask ourselves was the act childish, immature, or impulsive, some type of nature that would be consistent with youth. What we have in this case is none of that. We have a situation here that was, indeed, cold blooded and premeditated. This robbery was very well planned out. It was planned out with an ability far beyond the years that one would think a 16 year old would have.
Some of the things that have bothered this Court, because I sat on this trial and I have heard everything, is Mr. Torres knew Mr. Shum. They had prior dealings with each other. It struck this Court that when Mr. Torres and Mr. Gamboa went into the jewelry store to rob Mr. Shum no one wore any mask. It is obvious that since Mr. Shum knew Mr. Torres and, indeed, Mr. Torres was referring to him as Andy, that if he goes in and robs him without a mask, Mr. Shum is going to be able to identify him.
Now, that's not a great mystery, because Mr. Gamboa when he testified gave us the answer. When Mr. Gamboa said to Mr. Torres: Why did you shoot? Why did you do it? Mr. Torres' answer was: Because he could have identified us. That is why he killed him. And, quite frankly, from what I could see, the inference can be drawn, and I am drawing the inference, that that was in Mr. Torres' mind from the outset. That is why he didn't go in there with a mask. He knew he was going to have to kill this man to stop him from identifying him.
On top of that, Mr. Torres planned this out in meticulous detail. He secured the gun from another individual. The gun was loaded. I mention that because there had been some talk that they wanted to scare Mr. Shum with the gun, but that was not what happened here. If you want to *19 scare somebody with a gun, there is no need to load it.
They had a black bag that they walked in there with to put the jewelry in. There was supposed to be a rope in the bag that was going to be used to tie somebody up. If you are going to tie somebody up and scare them you don't need to have a loaded gun. You certainly don't go in there unmasked if the victim knows you. It makes no sense unless you are going to set out to kill him.
Now, the probation officer used the term "execution" in the presentence report. It is a strong term. But I have to say with all candor it does apply in this case. Because there were two shots that were fired in Mr. Shum. The first shot grazed through his neck. That was not a fatal wound.
At that point, Mr. Shum did plead for his life and did ask and tell the individuals: Take anything you want.
That wasn't enough. Mr. Torres rather cold bloodedly and at close range put another bullet into Mr. Shum's head. That was premeditated, deliberate, and it was indeed an execution of Mr. Shum so that Mr. Shum would not be able to identify Mr. Torres.
But the planning of this robbery did not end there. Then, as Mr. Shum lay dying on the floor, they step over his body, pull all of the jewelry out of the case, put it into the black bag that they brought for that purpose.
And then another rather cold-blooded act occurred. Mr. Shum had a device attached to his waist which was used to buzz people into and out of the store. At that point Mr. Torres reached over and pressed that buzzer to get out of the store while Mr. Shum was lying there and still making noises. Cold bloodedness.
And the thought process continued. After they leave, Mr. Torres has the presence of mind to secrete the gun so it is not found, then arrange to bring the jewelry over to New York to a place where it can be fenced. He sells the jewelry. He buys some cocaine for Mr. Gamboa, to give to Mr. Gamboa which was his proceeds from the robbery as well as some money.
It doesn't end there. After Mr. Torres is incarcerated, he then tries to, as Mr. Bianchi pointed out, bribe a corrections officer to get the corrections officer to perjure himself and say that Mr. Gamboa was the shooter.
I point all this out because these are not childish or immature acts. They bespeak a certain malevolence. They are well thought out. These are not impulsive or childish or immature things. These are not the types of crimes one can say we can attribute to youth.
This was truly a premeditated, malevolent act. It speaks of a very high level of premeditated malevolence.
Accordingly, for these reasons I have mentioned, I cannot find that his age is a mitigating factor because he did not act as a young person would act here. He acted with an evil far beyond his years.
The court thereby provided findings based on the record to support the aggravating factors of the need to deter, N.J.S.A. 2C:44-1(a)(9).
We are only to determine whether the findings of fact regarding aggravating and mitigating factors were based on competent and credible evidence in the record. State v. Roth, 95 N.J. 334, 363-64, 471 A.2d 370 (1984); State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). We must avoid substituting our judgment for the trial court's judgment. Roth, supra, 95 N.J. at 365, 471 A.2d 370. "When conscientious trial judges exercise discretion in accordance with the principles set forth in the Code and defined by [the Court], they need fear no second-guessing." Ibid.
The sentencing court here did not abuse its discretion in sentencing defendant to a custodial term of life with a thirty-year parole ineligibility period. Defendant was convicted of knowing or purposeful murder (N.J.S.A. 2C:11-3(a)(1) or (2)), a crime of the first degree. The Criminal Code contains the following sentencing provision for murder:

*20 Murder is a crime of the first degree but a person convicted of murder shall be sentenced,... by the court to a term of 30 years, during which the person shall not be eligible for parole or to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.

[N.J.S.A. 2C:11-3(b)(1).]
Based on the trial court's finding that this was a premeditated, cold-blooded, executionstyle murder, the sentence does not shock the conscience.

VII
We have carefully considered each of defendant's remaining contentions. However, in light of the entire record, we find them to be without sufficient merit to warrant discussion in this opinion. Rule 2:11-3(e)(2). We reject defendant's assertion that the errors, as alleged, because of their aggregate and cumulative impact, require reversal.
Affirmed.
NOTES
[1] The judgment of conviction indicates that defendant was sentenced to a custodial term of seventeen years with a six year parole ineligibility period on count three.